```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF TEXAS

 3                      MARSHALL DIVISION

 4   CSG SYSTEMS, INC.        )(

 5                            )(   CIVIL DOCKET NO.

 6                            )(   2:12-CV-712-JRG

 7   VS.                      )(   MARSHALL, TEXAS

 8                            )(

 9   TOA TECHNOLOGIES, INC.   )(   APRIL 18, 2013

10                            )(   9:00 A.M.

11                  MOTION TO TRANSFER HEARING

12         BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

13                 UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16

17   FOR THE PLAINTIFF:   (See attached sign-in sheet.)

18

19   FOR THE DEFENDANT:   (See attached sign-in sheet.)

20

21   COURT REPORTER:      MS. SHELLY HOLMES, CSR
                          Deputy Official Court Reporter
22                        2593 Myrtle Road
                          Diana, Texas 75640
23                        (903) 663-5082

24
     (Proceedings recorded by mechanical stenography,
25   transcript produced on a CAT system.)
```

2

1                          I N D E X

2

3   April 18, 2013

4                                              Page

5       Appearances                            1

6       Hearing                                3

7       Court Reporter's Certificate         148

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                COURT SECURITY OFFICER:  All rise.

 2                THE COURT:  Be seated, please.

 3                All right.  This is the time set for an

 4    evidentiary hearing on the Defendant's motion to

 5    transfer venue from the Eastern District of Texas to the

 6    Northern District of Ohio.  This is CSG Systems, Inc.

 7    versus TOA Technologies, Inc., Civil Action 2:12-CV-712.

 8                The Court will call for announcements at

 9    this time.

10                What says the Plaintiff?

11                MR. PICKETT:  Your Honor, John Pickett for

12    CSG Systems, together with lead counsel from Dorsey

13    Whitney, Lee Johnston, Denver, Colorado, as well as our

14    company representative, Scott Dutton.  Plaintiff's

15    ready, Your Honor.

16                THE COURT:  All right.  And announcements

17    from TOA, the Defendant?

18                MR. GILLAM:  Good morning, Your Honor.  Gil

19    Gillam on behalf of TO -- TOA Technologies.  Also with

20    me this morning Rob Isackson, Robert Uriarte, Ryan

21    Micallef, and Neal Chatterjee.  We're ready to go.

22                MR. CHATTERJEE:  Good morning, Your Honor.

23                THE COURT:  Good morning.

24                All right.  I understand that the movant and

25    the Plaintiff have witnesses to testify in this
```

1   evidentiary hearing.  Anyone that intends to testify in

2   this case, if you'll come forward at this time, we'll

3   have our courtroom deputy administer the oath to

4   everyone concurrently.

5                    (Witnesses sworn.)

6              THE COURT:  All right.  You can return to

7   your seats, gentlemen.

8              Is the Plaintiff -- is the movant, rather,

9   ready to call their first witness?

10             MR. ISACKSON:  Yes, Your Honor.

11             THE COURT:  And who does the Defendant wish

12  to call?

13             MR. ISACKSON:  Call Irad Carmi.

14             THE COURT:  All right.  If you'll come

15  forward and be seated here.

16             MR. ISACKSON:  Your Honor, if the Court will

17  permit, I have a brief opening I'd like to provide to

18  give you a layout of what we intend to do today.

19             THE COURT:  I'll afford both sides a brief

20  opening.  However, counsel, I've read your briefing, as

21  well as the supporting affidavits, and feel like I have

22  a pretty good grasp of the issues, so if you could, keep

23  your opening fairly limited.

24             MR. ISACKSON:  I -- I will, Your Honor.

25             THE COURT:  But you may proceed with your

1   brief opening.

2            MR. ISACKSON:  Thank you, Your Honor.

3            First, I'd like to alert the Court that we

4   filed a stipulation last night.

5            THE COURT:  I've read that, as well.

6            MR. ISACKSON:  Thank you.  Then in that

7   case, I will point out that we intend to present three

8   witnesses to address several of the factors -- the

9   Gilbert factors, primarily the ease of access to the key

10  sources of proof, compulsory process in the transferring

11  district, convenience and costs, and strong local

12  interest.

13           And with that, I will begin the examination

14  of Mr. Carmi.

15           THE COURT:  All right.  You may proceed

16  counsel.

17                    IRAD CARMI,

18  having first been duly sworn, testified as follows:

19                 DIRECT EXAMINATION

20  BY MR. ISACKSON:

21  Q.  Would you please state your full name and address

22  for the record?

23  A.  My name is Irad Carmi.  I live at 24810 Cedar

24  Road in Beachwood, Ohio.

25  Q.  Are you presently employed?

1      A.   Yes.

2      Q.   By whom?

3      A.   By TOA Technologies.

4      Q.   What's your position there?

5      A.   I'm the company's president and chief technology

6   officer.

7      Q.   How long have you had that position?

8      A.   Ten years.

9      Q.   How long have you lived in Beachwood, Ohio?

10      A.   Eleven and a half years.

11      Q.   Okay.  I'd like to turn briefly to your

12   background.  Can you please describe for the Court where

13   you grew up and your activities after high school until

14   you started at TOA Technologies?

15      A.   Absolutely.  I was born and raised in Israel.  I

16   had a passion for music from early childhood, and I went

17   to a music high school.  After high school, I served

18   three years in the Israeli Army.  And after my service

19   in the Army, I received a full scholarship to study

20   music at the Cleveland Institute of Music in Cleveland,

21   Ohio.  I spent four years there.  I got two degrees,

22   undergraduate and graduate degrees in music performance.

23   I also met my wife there, and after getting married, I

24   moved back to Israel where was the principal flutist of

25   the Israel Symphony for two years.  Following that, my

```
 1   wife pursued her career in New York City.  We moved back
 2   to the U.S.  And I freelanced in New York for three
 3   years and then in Southern California for a couple of
 4   years.  And at some point, I realized I also needed to
 5   make a living, and I looked into technology.  I -- I
 6   heard that the computer programming is one of those
 7   professions you can just do nothing -- to go back to
 8   school.  So I took four night classes in computer
 9   programming, got a job in 1996.
10            And until 1999, I held four different jobs
11   with different companies using different technology,
12   different programming languages and environment, solving
13   different business problems.  And by the end of '99, I
14   joined an Israeli start-up that opened an office in New
15   York City called Maxbill where I was appointed to run
16   their technology workforce in the U.S.  I worked there
17   for two and a half years.  That's where I met my partner
18   and co-founder of TOA Technologies, Yuval Brisker.  He's
19   the CEO of the company.  And following 9/11, this
20   company ceased operations in the U.S.
21            In 2002, I was mostly unemployed this year,
22   looking for things to do.  And at some point, I came
23   across an idea that seemed to be something -- the
24   technology consultant.  This idea was a problem that
25   people had as they were waiting for someone to serve
```

1  them, could be waiting for a doctor at doctor's office

2  or waiting at home for a cable technician.  And I

3  thought that technology should be able to transfer the

4  information, but -- on-time delivery or delays to the

5  person who's waiting for the service.

6          This became the basis of TOA Technologies.

7  I built computer program that did that, that was able to

8  communicate this kind of information to people waiting

9  for service.

10         I partnered with Yuval, my partner.  And by

11  mid-2003, we had the first customer interested in the

12  solution, and that's where we started operations.

13  Q.  When did you move to Beachwood, Ohio, and why did

14  you move there?

15  A.  I moved to Beachwood, Ohio, in August of 2001.

16  This was towards the end of my tenure with this Israeli

17  start-up, Maxbill, at which point I was traveling nearly

18  a hundred percent.  And we lived in New York City, and

19  we had a young child and two babies at home, and my wife

20  felt that she needed some help at home, and she wanted

21  to move back to Beachwood where her parents live.  So we

22  did that so she could be -- sit with her parents while I

23  travel.

24  Q.  What's your status regarding citizenship?

25  A.  I'm a U.S. citizen since 1997.

1    Q.  And where do you pay taxes?

2    A.  I pay taxes in Cleveland, Ohio.

3    Q.  Now, with regard to TOA Technologies, Inc., when

4    did that company formally get started and where did it

5    get started?

6    A.  The company started at my house in Beachwood in

7    the summer of 2003.  We incorporated in September 2003

8    and went public with a product in April of 2004.

9    Q.  Who owns TOA today?

10   A.  TOA is owned by venture capital investors and TOA

11   employees.

12   Q.  As of today, does TOA have any subsidiaries or

13   affiliates?

14   A.  Yes.  TOA has a subsidiary in the UK, in London,

15   and two subsidiary companies in Ukraine.

16   Q.  Where does TOA maintain offices?

17   A.  TOA maintains offices in Cleveland or Beachwood,

18   Ohio.  That's where our headquarter is, as well as in

19   London and in Kharkov, Ukraine.

20   Q.  When did the Beachwood, Ohio, office open?

21   A.  The Ohio office opened in 2005.

22   Q.  And how many employees did it have then?

23   A.  Right now?

24   Q.  No, in 2005.

25   A.  '5, there were two employees.

1    Q.   And those were who?

2    A.   My partner, Yuval, and myself.

3    Q.   And how many employees work in Beachwood today?

4    A.   55.

5    Q.   Does TOA have other employees throughout the

6    United States?

7    A.   Yes.

8    Q.   Where do they work, and why do they work there?

9    A.   These employees mostly work on a customer or

10   prospect premises, and they do that because that's --

11   we -- we have to be where our customers are, so they're

12   involved in the sales activities and product service

13   implementation activities.

14   Q.   What office space does the Beachwood office have

15   for visiting employees?

16   A.   We have seven hoteling stations for employees

17   that come and visit us, as well as several other offices

18   that are available for visitors.

19   Q.   How many employees visit TOA's Beachwood office

20   in a given day?

21   A.   It's about 10 people every day.

22   Q.   How many visiting employees can Beachwood -- can

23   the Beachwood office handle?

24   A.   The Beachwood office can handle up to 200

25   visiting employees.

1    Q.  Had TOA ever had any offices in Texas?

2    A.  No.

3    Q.  How far is the Beachwood, Ohio, office from the

4  federal courthouse in Cleveland?

5    A.  It is about 22 or 25 minutes, driving.

6    Q.  Okay.  I'd like to ask you to pick up the binder

7  of exhibits that should be on the desk there and turn to

8  Exhibit 14.

9          Can you tell us whether you're familiar with

10  this document and describe it for us briefly?

11    A.  Yes.  This document is a page from TOA's

12  corporate website.  It describes the leadership team of

13  the company.

14    Q.  Is this the current leadership team?

15    A.  Yes, it is.

16    Q.  Are these the key decision makers in the company?

17    A.  Yes.

18    Q.  Where do these people work?

19    A.  Yuval Brisker, the company's president, he works

20  at the Beachwood headquarter.  I work at the Beachwood

21  headquarter.  Brian Cook, CFO, works at the Beachwood

22  headquarter.  Bruce Grainger, general manager of the

23  Americas, works from his home in North Carolina and one

24  week a month from the headquarter in Beachwood.

25  Vladimir Mitrasinovic is the general manager, also works

1   in London and one week a month in the Beachwood

2   headquarter.  John Opdycke, vice president of marketing,

3   works at the Beachwood office.  Alexey Turchyn, vice

4   president of technology, at the Beachwood office.

5   Markus Remark, vice president of customer operations,

6   works two weeks at the Beachwood office and two weeks on

7   the road.  Jeff Wartgow, VP, channels and alliances,

8   works in the Beachwood office.  And Michael McDonnell,

9   VP, global talent acquisition, also works in the

10  Beachwood, Ohio, office.

11      Q.  You mentioned Mr. Remark has two weeks in the

12  office and two weeks on the road.  Where is his

13  residence?

14      A.  He lives in Austin, Texas.

15      Q.  With respect to agreements that bind the company,

16  who has authority in the company to make those

17  agreements?

18      A.  Yuval Brisker, company CEO.

19      Q.  Does anyone else?

20      A.  I have this authority.

21      Q.  And anyone else?

22      A.  And Brian Cook, head company CFO.

23      Q.  And all three of you are located in Cleveland, is

24  that -- did I understand your testimony correctly?

25      A.  That's correct.

1    Q.  Now, you understand that TOA's ETAdirect Routing

2    Solution is at issue in this case?

3    A.  Yes, I do.

4    Q.  Can you briefly describe the routing solution and

5    what kind of problems it solves?

6    A.  Routing is a process or solution that allows

7    taking a large number of tasks and assigning them to

8    employ -- mobile employees usually who will be

9    performing those tasks in a way that is cost effective

10   for the company that provides a service.

11   Q.  What kind of companies are TOA's customers and

12   potential customers?

13   A.  TOA's customers -- potential customers are any

14   company's mobile employees.  We provide mobile

15   management.  Some customers that TOA has are Home Depot

16   and DISH Networks, Virgin Media, Ohio Telecom, Cox

17   Communications, and such.

18   Q.  Where are these companies and prospective

19   customers located?

20   A.  TOA's customers and prospects are located all

21   over the world.

22   Q.  Can you briefly describe for the Court how the

23   ETAdirect Routing Solution gets information from

24   customers and solves these problems?

25   A.  Yes.  They get direct solution, creates profile

1   of performance patterns for each individual mobile

2   employee in the field that allows the solution to

3   understand how long it will take people to perform

4   specific tasks during the day.  The routing solution

5   uses this information with information that represents

6   the cost to the company that routes the employees to --

7   the mobile employees.  What is the cost of sending those

8   employees to specific tasks and produces a result using

9   something called genetic algorithm.  It shuffles all the

10   tasks, randomly assigns them to individual employees,

11   and then goes through iterations to try to minimize the

12   cost of these assignments.

13      Q.  How does TOA deliver the ETAdirect Solution to

14   its customers?

15      A.  ETAdirect is delivered as a web application

16   through a browser.

17      Q.  And where -- where are the computers that run the

18   ETAdirect Solution physically located?

19      A.  The servers that run ETAdirect are located in

20   Miami, Florida.

21      Q.  Who controls those computers?

22      A.  TOA Technologies.

23      Q.  From what offices?

24      A.  From the Cleveland office and from the Ukraine

25   offices.

1    Q.  What, if anything, does TOA install on its

2  customers' computers and devices?

3    A.  Nothing.  TOA doesn't install anything on the

4  customers' computers.

5    Q.  Who at TOA would know the most about the original

6  design and development of the ETAdirect Routing

7  Solution?

8    A.  This would be Alexey Turchyn, VP, technology.

9    Q.  Is there anyone no longer at TOA that would know

10  more about it?

11    A.  No.

12    Q.  Who, to your understanding, at TOA is most

13  knowledgeable about the technology underlying the

14  ETAdirect Routing Solution, and where are they located?

15    A.  Again, this would be Alexey Turchyn.  He's

16  located in the Cleveland office.

17    Q.  Is there anyone no longer at TOA that would know

18  more?

19    A.  No.

20    Q.  Who, to your understanding, at TOA is most

21  knowledgeable about the -- designing the functionality

22  of the software?

23    A.  Again, this would Alexey Turchyn.

24    Q.  Who, to your understanding, at TOA is the most

25  knowledgeable about the programming -- the coding of the

1    ETAdirect Solution for customers, and where are they

2    located?

3        A.  Again, Alexey Turchyn, Cleveland, Ohio.

4        Q.  Who at TOA would know the most about the

5    marketing and sales of the ETAdirect Routing Solution in

6    the United States, and where are they located?

7        A.  The person who knows the most about marketing

8    TOA's routing in the U.S. is John Opdycke, VP of

9    marketing, located in Beachwood, Ohio, headquarters.

10   The person who knows the most about sales would be -- in

11   North America would be Bruce Grainger, the VP GM of

12   Americas.

13       Q.  And who at TOA would know the most about the

14   competitive landscape for TOA and the ETAdirect Routing

15   Solution?

16       A.  That would be pretty much everybody who works at

17   TOA, especially at the headquarter in Beachwood.

18       Q.  Okay.  Who at TOA would know the most about what

19   TOA tells its customers and prospective customers about

20   how to use the ETAdirect Solution?

21       A.  Prospective customers receive information

22   produced by our Marketing Department, and customers

23   receive information created and -- and delivered by our

24   Training Department.

25       Q.  Who heads the Training Department, and where are

1  they located?

2      A.  Training is headed by Erik Ristuben.  He's

3  located in the Boston area, Massachusetts.

4      Q.  And is there a customer support function?

5      A.  Yes, there is.

6      Q.  Who heads that up?

7      A.  Customer support is headed by Ron Thorne.

8      Q.  Where is he located?

9      A.  He's located at the Cleveland/Beachwood

10  headquarters.

11      Q.  Who would know most about TOA's finances, costs,

12  and revenues since January of 2006?

13      A.  This would be several people who were in charge

14  of TOA's finances since -- since 2006.  Currently, it's

15  Brian Cook, TOA's CFO.  Prior to Brian, Fred Binstock

16  was -- was CFO.  Brian has been with us for six months.

17  Fred, before him, was with the company for three years.

18  Prior to Fred was Ziv, Z-i-v, Sarig, S-a-r-g (sic), and

19  he was also with the company for three years.  And prior

20  to Ziv was Sharon Means.  She was company controller in

21  2006.

22              THE COURT:  Mr. Carmi, if you would, try to

23  use complete names.  First names only are -- are often

24  confusing in the record.

25              THE WITNESS:  Okay.

```
 1                THE COURT:  So please refrain from using
 2    first names only.
 3                THE WITNESS:  Okay.
 4                THE COURT:  Continue.
 5       Q.  (By Mr. Isackson)  Are you familiar with Megan
 6    O'Neil Miller?
 7       A.  Yes, I am.
 8       Q.  Who is she, and what was her role in TOA?
 9       A.  Megan was VP of administration at TOA -- was
10    managing all the contractural agreements of TOA and at
11    times, between CFO, she oversaw company finances.
12       Q.  By Megan, you're referring to Ms. Miller?
13       A.  Ms. Miller -- Megan O'Neil Miller.  Thank you.
14       Q.  And where are those four individuals located
15    today?
16       A.  They are located in Cleveland, Ohio.
17       Q.  Is it correct that they're no longer employees of
18    the company?
19       A.  That's correct.
20       Q.  Then how do you know that they're located in
21    Cleveland, Ohio?
22       A.  I spoke with them last week.
23       Q.  What did you discuss with them?
24       A.  I informed them that TOA was sued by CSG for
25    patent infringement, and there's a possibility that
```

1   TOA's finances will need to be discussed in court

2   proceedings between -- and covering the period of 2006

3   to today, and it is possible that may need to come and

4   testify.

5       Q.  How did they respond about coming to testify?

6       A.  They were concerned about the location of the

7   trial.

8       Q.  What was the concern they expressed to you?

9       A.  It was concern about travel.  They -- some of

10  them have little children.  Some of them are disabled.

11  They cannot travel.  And they were concerned about the

12  effort of traveling from Cleveland to Marshall, Texas.

13      Q.  Did they say that they would travel or they would

14  not travel?

15      A.  They said that they will not travel.

16      Q.  Did -- did anyone give you reasons why they

17  wouldn't travel in specifics?

18      A.  They did.  Fred Binstock is -- is ill.  He cannot

19  travel outside Cleveland.  Sharon Means, again, has

20  young kids, and she cannot leave them for three days or

21  four days.  And Ziv Sarig and Megan O'Neil Miller are

22  now employed and cannot take the time to come here and

23  testify.

24      Q.  Okay.  I'd like to turn to a different topic now,

25  address some of the employees of TOA that are referenced

1   in the stipulation.  Do you know Hamid Hajibishi?

2       A.  Yes, I do.

3       Q.  How long has he worked for TOA Technologies?

4       A.  Hamid has worked for TOA for eight years.  I

5   mean, Hamid Hajibishi has worked for TOA for eight

6   years.

7       Q.  Are there people at TOA in Ohio who know as much

8   or more about the ETAdirect Solution than Hamid

9   Hajibishi does?

10      A.  Yes.

11      Q.  Can you name one?

12      A.  One would be Olli, O-l-l-i, Patrikainen, it's

13  P-a-t-r-i-k-a-i-n-e-n.

14      Q.  Do you know Tom Meeks?

15      A.  I do.

16      Q.  How long has he worked for TOA?

17      A.  Tom Meeks has been with TOA for a year and eight

18  months.

19      Q.  Are there people at TOA in Ohio who would know as

20  much or more about him than the ETAdirect -- about the

21  ETAdirect?

22      A.  Yes.

23      Q.  Can you name one?

24      A.  One would be Will Cox.  He's a TOA product

25  manager.

1     Q.  And where is Mr. Cox based?

2     A.  In Cleveland, Ohio.

3     Q.  Do you know Markus Remark?

4     A.  Yes, I do.

5     Q.  How long has he worked for TOA?

6     A.  Markus Remark has been with TOA for a year and 10

7  months.

8     Q.  Are there people at TOA in Ohio who know as much

9  or more about him than about ETAdirect?

10    A.  Yes.  Markus' focus is not the product ETAdirect,

11  but rather he's in charge of customer operation of

12  delivering service to customers.

13    Q.  Do you know Brian Garwood?

14    A.  I do.

15    Q.  How long has he worked for TOA?

16    A.  Brian has been with TOA for three and a half

17  months.

18    Q.  Are there people at TOA in Ohio who know as much

19  or more about (sic) him about ETAdirect?

20    A.  Yes.

21    Q.  Can you name one?

22    A.  Shawn Fergus, the director of marketing at TOA.

23    Q.  Do you know Travis -- Travis Somerville?

24    A.  Yes, I do.

25    Q.  How long has he worked for TOA?

1     A.  Travis Somerville has been with TOA for close to

2  two years.

3     Q.  Are there people at TOA in Ohio who know as much

4  or more about ETAdirect than him?

5     A.  Yes.

6     Q.  Can you name one?

7     A.  Jeff Wartgow, VP of channels and alliances.

8     Q.  Do you know Danny Little?

9     A.  I do.

10     Q.  How long has he worked for TOA?

11     A.  Danny Little has worked for TOA for four and a

12  half years.

13     Q.  Are there people at TOA in Ohio who know as much

14  or more than him about ETAdirect?

15     A.  Yes.

16     Q.  Can you name one?

17     A.  This would be, again, Will -- Will Claxton, not

18  Cox.  I made a mistake in his name.  It's Claxton.  Will

19  Claxton, Jeff Wartgow, they would know more than --

20          THE COURT:  Tell me how you know that this

21  person you just named knows more than Mr. Little.

22          THE WITNESS:  Mr. Little is a sales engineer

23  at TOA.  His expertise is understanding the features and

24  functions of the solution and how they fit prospective

25  customers and actual customers.  The people that I

1    mentioned, they know the underlying technology of the

2    solution, the architecture, and the -- and the

3    principles that drive the code that provides the

4    service.  And my understanding, based on reading the

5    patents, the CSG patents and the claims is that that's

6    what the lawsuit is about.

7              THE COURT:  And that's the basis that you

8    represent to the Court that one person knows as much or

9    more than another person?

10             THE WITNESS:  It's the basis.  And in

11   addition to that, knowledge is a function of tenure with

12   the company.  So the people like Travis or Danny Little

13   have been with the company for two or four years.  The

14   people who have been at the company for longer and by

15   definition know more are people in the more senior

16   positions who have access to more information about the

17   product and the company.

18             THE COURT:  So the amount of knowledge

19   somebody has is a direct correlation to how long they've

20   worked for the company, in your view?

21             THE WITNESS:  Not only.  It's part of the --

22   part of the knowledge.  It's -- the amount of knowledge

23   is first and foremost -- it's -- it's a result of the

24   focus of that person.  The -- the direction of the role

25   the person takes, also the tenure with the company, as

1  well as the position in the company.

2            THE COURT:  Now, Mr. -- Mr. Little no longer

3  works for your company, does he?

4            THE WITNESS:  No, he still works for TOA.

5            THE COURT:  He does still work for your

6  company?

7            THE WITNESS:  Yes, yes.

8            THE COURT:  Did he previously work for the

9  Plaintiff in this case?

10            THE WITNESS:  He did.

11            THE COURT:  Okay.  So he has knowledge from

12  both sides of this lawsuit; would you agree with that?

13            THE WITNESS:  I -- I don't know what

14  knowledge he has of this CSG lawsuit.  He definitely has

15  knowledge from TOA's side.

16            THE COURT:  And -- and has -- he has

17  knowledge from CSG's side, as well, does he not?

18            THE WITNESS:  He does, yes.

19            THE COURT:  Now, does this Mr. Claxton --

20  Mr. or Ms. Claxton you mentioned as having comparable

21  knowledge, do they have the same level of comparable

22  knowledge from the CSG side that Mr. Little would have?

23            THE WITNESS:  No -- no different knowledge.

24            THE COURT:  All right.  Continue, counsel.

25     Q.  (By Mr. Isackson)  Do you know Tumara Hayak?

1     A.  I do.

2     Q.  How long has she worked as a contractor to TOA?

3     A.  Several weeks.

4     Q.  Are there people at TOA in Ohio who know as much

5  or more about (sic) her than about the ETAdirect

6  Solution?

7     A.  Yes.

8     Q.  Can you name one?

9     A.  Shawn Nicely.

10    Q.  I'd like to turn to the issue of documents.

11 Where are TOA's documents stored, and how are they

12 stored?

13    A.  TOA documents are filed in file folders at the

14 Beachwood headquarter in Ohio.

15    Q.  Are they filed in hard copy or electronically or

16 both?  Can you explain that, please?

17    A.  Documents are filed in hard copy.  Since 2011, we

18 introduced electronic file management system.  And since

19 then, documents are scanned and uploaded to the

20 electronic -- document management system.  Prior to

21 2011, I know that many documents were scanned and

22 uploaded to that system, as well.

23    Q.  Now, what documents exist in hard copy in Ohio?

24    A.  This would be customer contracts, vendor

25 contracts, accounts payable and receivable, employee

1    records, design documents, and notebooks where employee

2    takes notes during meetings.

3              THE COURT:  Are those only in hard copy

4    form, or have they also been uploaded and are now also

5    in digital form?

6              THE WITNESS:  The notebooks are not in

7    digital form.  They're only in hard copy.  The contract

8    and design documents, I know they were definitely

9    uploaded since 2011.  Prior to '11 --

10             THE COURT:  I'm talking about today.

11             THE WITNESS:  Oh, today, yes.  Today --

12             THE COURT:  Of the documents you listed

13   today, which of those are only in hard copy form, the

14   notebooks?

15             THE WITNESS:  Notebooks, yes.

16             THE COURT:  Everything else would be

17   digital, as well as hard copy?

18             THE WITNESS:  From 2011 on and a great

19   percentage prior to that, as well.

20             THE COURT:  All right.  Continue.

21        Q.  (By Mr. Isackson)  Okay.  To what extent has TOA

22   confirmed that all documents related to ETAdirect have

23   been scanned?

24        A.  We -- we haven't confirmed that.

25        Q.  Approximately how many customers does TOA have in

1   the United States that use ETAdirect Routing Solution?

2       A.   About 25 customers.

3       Q.   How many are headquartered in Ohio?

4       A.   Two of them are headquartered in Ohio.

5       Q.   Who are they, and where are they located?

6       A.   One is Cincinnati Bell.  They're located in

7   Cincinnati, Ohio.  Another one is Windstream

8   Communication, the operation center of Windstream that

9   uses the routing is located in Twinsburg, Ohio.

10      Q.   Where is Twinsburg in relation to Beachwood?

11      A.   Twinsburg is a suburb of Cleveland.  It's about a

12  50-minute drive from Beachwood.

13      Q.   How many TOA customers used the ETAdirect Routing

14  Solution within a hundred miles of Cleveland?

15      A.   Three customers for sure.  That would be

16  Windstream, Cincinnati Bell, and Cox Communications.

17      Q.   Are any of TOA's customers headquartered in

18  Texas?

19      A.   No.

20      Q.   Are you familiar with DISH Network?

21      A.   I am.

22      Q.   Is -- what's the relationship between DISH and

23  TOA?

24      A.   DISH Network is a TOA customer.

25      Q.   How long has it been a customer?

1     A.  About two and a half years.

2     Q.  When did you first start trying to sell ETAdirect

3  Solution to DISH?

4     A.  2007.

5     Q.  In all those years, have you ever met with DISH

6  executives in Texas?

7     A.  No.

8     Q.  Would trial in Cleveland, Ohio, be more

9  convenient for your employees than Marshall, Texas?

10    A.  Yes, it will be.

11    Q.  Why would it be?

12    A.  Because we have work that needs to be done, and

13 traveling to such extent as Marshall, Texas, requires a

14 lot of time.  And during the travel time, it is very

15 hard to do work, definitely cannot attend meetings.

16    Q.  What about employees who might come from the

17 Ukraine?  Would trial in Cleveland be more convenient

18 for them rather than in Marshall, Texas?

19             MR. JOHNSTON:  Objection, foundation, Your

20 Honor.

21             THE COURT:  I'll sustain the objection.

22             Re-ask the question.

23    Q.  (By Mr. Isackson)  Have you ever traveled to the

24 Ukraine?

25    A.  Yes, I have.

```
 1     Q.  To visit TOA's offices and subsidiaries there?

 2     A.  Yes.

 3     Q.  Do you know about how long it takes to travel

 4   from the Ukraine to Cleveland?

 5     A.  Yes, it takes 18 hours.

 6     Q.  For employees who might come from the Ukraine,

 7   would trial in Cleveland be more convenient than travel

 8   to Marshall, Texas, for trial?

 9               MR. JOHNSTON:  Same objection, Your Honor.

10               THE COURT:  I assume, counsel, the substance

11   of your objection is speculation?

12               MR. JOHNSTON:  That's correct.

13               THE COURT:  I'll sustain on that basis.

14     Q.  (By Mr. Isackson)  Do you have any understanding

15   of how long it takes to travel from the Ukraine to

16   Marshall, Texas?

17     A.  I do.

18     Q.  And what's your understanding?  What's it based

19   on, too?

20     A.  It is based on being familiar with the traveling

21   to Ukraine from Cleveland, from Washington, D.C., or

22   from New York City, and also my travel experiences

23   travelling to Marshall, Texas, and figuring out what it

24   would take to make the connection between a Ukraine

25   flight to reach Marshall, Texas.
```

1     Q.  Do Ukraine employees come to visit TOA in Ohio

2  and work there?

3     A.  Yes, they do.

4     Q.  Is it a convenient place for them to work in

5  Ohio?

6     A.  It is, yes.

7     Q.  Is Marshall, Texas a convenient place for your

8  employees from the Ukraine to get work done?

9     A.  Would be less convenient than Cleveland.

10          THE COURT:  You would agree, Mr. Carmi, that

11  both Cleveland and Marshall, Texas, are a long way from

12  the Ukraine?

13          THE WITNESS:  Yes.

14          THE COURT:  You would agree it's not easy to

15  get from the Ukraine to either place?

16          THE WITNESS:  Yes.

17          THE COURT:  Okay.  Continue.

18     Q.  (By Mr. Isackson)  To what extent can you carry

19  out your job duties and responsibilities as effectively

20  while traveling as when you're in your office?

21     A.  To a fairly minimum extent, it -- it took me

22  eight hours to get here yesterday, and it will take me

23  eight hours to get back tomorrow.  And I have no office

24  space here, so I cannot meet people or conduct phone

25  conversations or review documents and -- and respond to

1    the requests.

2              THE COURT:  You can't have conversations

3    from here?  You don't have a telephone?  You don't have

4    a laptop or an iPad?  You can't review documents from

5    here?

6              THE WITNESS:  I can, but not when I'm -- not

7    in motion, not when I travel, so those eight hours --

8              THE COURT:  I understand during the travel

9    time.  But once you land, you're connected as well as

10   you would be if you were at the courthouse in Cleveland,

11   are you not?

12             THE WITNESS:  That's correct.

13             THE COURT:  I mean, neither location is in

14   your office behind your desk, right?

15             THE WITNESS:  That's right, but from

16   Cleveland and courthouse, I can --

17             THE COURT:  I understand the travel time is

18   different.

19             THE WITNESS:  Yeah.

20             THE COURT:  But notwithstanding the travel

21   time, when you're out of the office, you're out of the

22   office, whether it's in Cleveland or whether it's in

23   Marshall, correct?

24             THE WITNESS:  That's correct, that's

25   correct.

1          THE COURT:  All right.  Continue.

2     Q.  (By Mr. Isackson)  Has TOA received any

3 recognition for its business activities?

4     A.  Yes.

5     Q.  What kind of recognition has it received?

6     A.  TOA received recognition from industry analyst

7 companies.  One example is Gardener that declared TOA to

8 be a leader of its industry and leading visionary in the

9 field.  TOA received recognition from an industry

10 watching groups, like, for example, Forbes.  Forbes

11 labeled TOA three months ago as one of the top 100 U.S.

12 companies to watch in the future.

13          Another recognition comes from TOA

14 customers.  Cox Communications awarded TOA an award for

15 being the most successful and most impactful vendor that

16 Cox worked with.  Partners provided TOA awards for being

17 supporting and successful partners, as well as business

18 groups in Northeast Ohio, such as the Weatherhead 100

19 that awarded TOA the number one spot of the top growing

20 company in Northeast Ohio.

21     Q.  I ask you to turn to the exhibit binder, Exhibit

22 No. 100, please.

23     A.  Okay.

24     Q.  Can you identify -- do you recognize this

25 document?  Can you tell us what it is, please?

1    A.  These are pages from TOA's website that describes

2  awards that TOA received.

3    Q.  Okay.  Excuse me.  If you could please turn to

4  Exhibit 101 and tell us if you recognize that document

5  and explain what it is.

6    A.  Exhibit 101 is also pages from TOA's corporate

7  website that lists media coverage that TOA received,

8  article mentions in -- in the press.

9    Q.  How significant are the awards and recognition

10  that TOA's -- has received as demonstrated by Exhibit

11  100?  How important are they to TOA?

12    A.  They're quite important because they allow us to

13  present TOA as a company to watch, as a company that is

14  reliable and trustworthy, give us an opportunity to

15  engage in public relations activities and can spread our

16  name around and hopefully reach potential customers.

17    Q.  How significant is the media recognition, as

18  demonstrated in Exhibit 101, to TOA?

19    A.  It's very significant because, again, it shows

20  that when one had -- a lot of attention is paid to TOA,

21  and it also can show that TOA can -- that the name and

22  information about our product reaches very, very far.

23    Q.  Can you identify some of the media recognition

24  that you received in the Cleveland area from

25  Exhibit 101?  Just give us an example or two.

1     A.  Yes.  Exactly three week ago, there was an

2   article about TOA in the Cleveland Plain Dealer.  It's

3   the main newspaper in Cleveland.  And it mentioned the

4   success of the company, what the success means to city

5   of Beachwood where we operate and the fact that we won

6   the Forbes award.

7     Q.  Cleveland is a very large city with many

8   companies and lots of employees.  How significant is TOA

9   to the Beachwood, Ohio, community?

10            MR. JOHNSTON:  Objection, Your Honor.

11    A.  The significant is -- Beachwood is a very small

12  city -- a small suburb of Cleveland.  When Yuval and I

13  started the company, we had no means and no finances and

14  used all our savings and a home equity loan.  And the

15  city of Beachwood was kind enough to give us the support

16  in starting the company.

17            And in return today, we have 55 taxpayers in

18  Beachwood, Ohio, and we also represent the city's kind

19  of business acumen.  So the city uses us as a means to

20  attract additional business into the city.

21            MR. ISACKSON:  No further questions, Your

22  Honor.

23            THE COURT:  Cross examination?

24            MR. JOHNSTON:  Yes, Your Honor.  Thank you.

25            THE COURT:  Before -- before Plaintiff's

1    counsel cross examines, I have just a couple more

2    questions of the witness.

3               When did you travel from the Cleveland area

4    to Marshall for this hearing?

5               THE WITNESS:  When?

6               THE COURT:  When?

7               THE WITNESS:  Yesterday morning.

8               THE COURT:  All right.  And how did you --

9    how did you fly from Cleveland to Marshall?

10              THE WITNESS:  I took a 6:00 a.m. flight from

11   Cleveland to Shreveport -- sorry, to Houston, and then

12   from Houston, I flew to Shreveport, and I rented a car

13   from Shreveport and drove here.

14              THE COURT:  All right.  And which carrier

15   did you fly from Cleveland to Houston?

16              THE WITNESS:  United Airlines.

17              THE COURT:  Okay.  And how long were you in

18   the Houston airport before you flew to Shreveport?

19              THE WITNESS:  One hour.

20              THE COURT:  I assume you flew in and out of

21   Bush International Airport in Houston, or was it Hobby?

22   There are two airports in Houston.

23              THE WITNESS:  I think it's Bush.  It's a

24   very large airport.

25              THE COURT:  Okay.  On the United flight that

1   you took from Cleveland to Houston, was there Wi-Fi

2   available on the airplane?

3            THE WITNESS:  No.  It was a very small

4   airplane.

5            THE COURT:  It was -- all right.  During the

6   hour that you were at the Bush Intercontinental Airport,

7   was there Wi-Fi and digital access available to you

8   there?

9            THE WITNESS:  Yes.

10            THE COURT:  Did you connect either with a

11   smartphone or a tablet or any other device and access

12   any of yours business records while you were in the

13   Houston airport?

14            THE WITNESS:  Yes.

15            THE COURT:  If the plane you took from

16   Cleveland to either Houston or Dallas, being the major

17   hubs that service this area, had had Wi-Fi, you would

18   have had that ability while you were on the flight,

19   correct?

20            THE WITNESS:  That's correct.

21            THE COURT:  All right.  Continue --

22   cross-examination.

23            MR. JOHNSTON:  Thank you, Your Honor.

24                      CROSS EXAMINATION

25   BY MR. JOHNSTON:

1    Q.  Good morning, Mr. Carmi.

2    A.  Good morning.

3    Q.  I had a -- have a few questions for you based on

4    your testimony and our discussion last week when we took

5    your deposition.

6    A.  Uh-huh.

7    Q.  I'd like to -- you have a binder in front of you.

8    There's a number of tabbed exhibits.  There's an Exhibit

9    1 that you hopefully can find in front of you.

10    A.  Yes, I see it.

11    Q.  Let me know when you have that in front of you.

12    A.  I have it.

13    Q.  And this is a -- the ETAdirect fact sheet that

14    appears on your company website; is that correct?

15    A.  That's correct.

16    Q.  I'd like to talk a little bit -- you -- you've

17    mentioned a little bit about the ETAdirect product, and

18    I want to make sure I understand the nature of its use

19    and the like.  This fact sheet is intended to highlight

20    the key functionality for prospective customers for the

21    ETAdirect product; is that correct?

22    A.  That's correct.

23    Q.  And it's designed to highlight that functionality

24    which exists, at least in TOA's mind, above and beyond

25    the competition, correct?

 1    A.  I don't know if it's above the competition.  It's

 2  just the functionality that TOA believes is -- should be

 3  attractive to the customers.

 4    Q.  Sure.  Well, if you'd look in the first bolded

 5  sentence it says, only ETAdirect lets you plan,

 6  schedule, dispatch, monitor, and communicate real-time

 7  with -- do you see that?

 8    A.  Yes.

 9    Q.  Did I read that right?

10    A.  Yes.

11    Q.  And it includes in the bullet below there, the

12  field and mobile employees.  Do you see that?

13    A.  Yes.

14    Q.  And these are -- let's take the telecom and --

15  and cable industry.  These would be the fellows who --

16  or gals who come and actually show up at my house to

17  install a cable modem or -- or fix my picture

18  connectivity to the cable box or something like that?

19    A.  That's correct.

20    Q.  And if you look at this fact sheet, it states,

21  ETAdirect is a zero-footprint application and can be

22  accessed from any Internet-enabled device including

23  mobile phones, PDAs and laptops.  Did I read that right?

24    A.  Yes.

25    Q.  And when you were talking earlier about the fact

1    that ETAdirect is a cloud-based solution and you can

2    access it anywhere, does that go for mobile field

3    technicians, as well?

4        A.  Yes.

5        Q.  So the mobile field technician who is at my house

6    or at a house here in the Eastern District of Texas, he

7    can and does access the ETAdirect Solution so that he

8    can input, for instance, the job is taking too long or

9    the job has taken longer than I thought it would take,

10   I'm still at the house.  He can -- he can put that kind

11   of information in?

12       A.  As long as he has access using a password.

13       Q.  Right.

14       A.  Access to the system, yes.

15       Q.  And to your understanding, Mr. Carmi, that's

16   happening here in the Eastern District of Texas, that

17   is, you don't have any reason to doubt that customers

18   such as DISH or Suddenlink, their mobile technicians, be

19   their contract employees or full fledge DISH or suddenly

20   link employees, those mobile technicians are accessing

21   and inputting that type of information here in the

22   Eastern District of Texas?

23       A.  I know that Suddenlink has technicians in the

24   Eastern District of Texas, and I know that DISH has

25   contractors, but I don't know if the contractors use the

1   solution or not.  And if they do, to what extent.

2      Q.  We'd need to talk to those contractors, correct?

3      A.  Yes.

4      Q.  Are you aware of a company called Southern Star?

5      A.  Yes.

6      Q.  And is it your understanding that Southern Star

7   is one of the contractors that provides mobile field

8   technicians to DISH subscribers here in the Eastern

9   District of Texas?

10     A.  Yes.

11     Q.  Can you take a look at Exhibit 2 behind your --

12  in your binder, Mr. Carmi?  Let me know when you have it

13  in front of you.

14     A.  I see it.

15     Q.  This is a document entitled "Customer Appointment

16  Management."  And it appears on your company's website;

17  is that correct?

18     A.  That's correct.

19     Q.  And like the prior exhibit, it's designed to

20  highlight and promote TOA's ETAdirect Solution to

21  prospective customers who might be visiting the website?

22     A.  Uh-huh, right.

23     Q.  Is that right?

24     A.  That's right.

25     Q.  Take a look at Page 4 of Exhibit 2.  You talk

1   about -- or -- or this document talks about two

2   over-arching business objectives or key business drivers

3   for your customers.  Do you see that?  About two lines

4   in.  One is to increase efficiency and reduce costs by

5   optimizing workflow between the field and the

6   dispatchers.  And the second is to improve customer

7   satisfaction by leveraging appointment as a

8   relation-building opportunity.  Do you see that?

9      A.  Yes.

10     Q.  And one of the ways that TOA distinguish

11  itself -- distinguishes itself over the competition is

12  to -- is its ability to provide functionality to both

13  employee mobile field technicians, as well as contractor

14  mobile field technicians; is that right?

15     A.  That's right.

16     Q.  And it does this because it uses a module --

17  well, tell me what -- what module is that within the --

18  the ETAdirect software that -- that allows the mobile

19  field technician to provide status information about his

20  or her visit with the customer?

21     A.  This would be the mobile application --

22     Q.  Okay.

23     A.  -- of ETAdirect.

24     Q.  And that's -- and the reason why you can

25  distinguish yourself, or at least tout yourself or your

1   product in terms of being able to be available for

2   contract or independent contractor tech --

3   technicians is that this mobile or mobility module is

4   diagnostic -- or, I'm sorry, is -- is device agnostic;

5   is that right?

6       A.  That's right.

7       Q.  And can you explain to the Court what you mean by

8   device agnostic?

9       A.  Yes.  Typically, mobile applications require a

10  specific mobile device to run properly, android device

11  or iPhone or anything like that, because they are

12  installed on that device.  They are dependent on the

13  operating system on the device.

14          We provide a solution through a browser, and

15  as long as the device can run a browser, it doesn't

16  matter what device it is or who's the carrier.  If the

17  browser is a current browser, they can access that

18  solution.  So by that, we mean device agnostic.

19      Q.  And that's what contractors who are serving

20  customers for DISH are using, correct?

21      A.  Yeah.  I don't know exactly what the contractors

22  are using because our contract is with DISH, as it is

23  with many other companies.  And those customers of ours,

24  they're allowed to offer our solution to their

25  contractors, but we have no relationship or

1    communication with -- with this contractor, so we don't

2    know how much and what they use of our solution.

3        Q.  Again, we would need to speak with the folks at

4    Southern Star to confirm that information; is that

5    correct?

6        A.  I cannot speak directly.  I can only speak with

7    DISH, my customer.

8        Q.  I understand that, but one source of information,

9    would it not be, would be Southern Star?

10       A.  Yes.

11       Q.  And it's your understanding that Southern Star

12   has offices here in the -- in the Eastern District,

13   correct?

14               MR. ISACKSON:  Objection, foundation.

15               MR. JOHNSTON:  I asked for his

16   understanding, Your Honor.

17               THE COURT:  Do you know, or do you not know?

18               THE WITNESS:  I don't know where their

19   offices are.  I understand that they serve this area.

20               THE COURT:  All right.  Continue.

21               MR. JOHNSTON:  Thank you, Your Honor.

22       Q.  (By Mr. Johnston)  Take a look at Page 6 of

23   Exhibit 2.  Do you have that in front of you?  The page

24   starts off "ETAdirect Overview"?

25       A.  Yes.

1     Q.  It talks about various modules.  We've talked

2  about the mobility module.  There's also a reference

3  here to ETAdirect Manage -- Dispatch & Monitoring.

4     A.  Uh-huh.

5     Q.  Do you see that?

6     A.  Yes.

7     Q.  And is it correct that this is the module that

8  provides the -- for lack of a better word, the

9  visibility back to the dispatcher as to how a particular

10  job might be going for a particular mobile field

11  technician?

12     A.  That's correct.

13     Q.  And is it correct that DISH implemented that

14  module as part of its overall ETAdirect implementation?

15     A.  Yes.

16     Q.  How about Suddenlink?

17     A.  Also, yes.

18     Q.  Take a look at Exhibit 3.  You have another TOA

19  fact sheet --

20     A.  Okay.

21     Q.  -- from your company website that's entitled TOA

22  Technologies Solution -- Solutions for Cable &

23  Telecommunications.  Do you see that?

24     A.  Yes.

25     Q.  Okay.  If you could turn to Page 2 of this

1    document, it talks about powerful mobility.

2        A.  Uh-huh, yes.

3        Q.  And this is what the -- the -- the mobility

4    module that we talked about earlier that allows the

5    field technician to report on his or her status on a

6    job, for instance?

7        A.  Yes.

8        Q.  And that's occurring here in the Eastern District

9    of Texas, correct?

10       A.  Yes.

11       Q.  And it talks about the ETAdirect Manage -- I'm

12   sorry, ETAdirect Manage Module as being a central hub

13   reviewing and managing all activities related to the

14   mobile workforce.  Do you see that?

15       A.  It's on the same page, Page 2?

16       Q.  Oh, I'm sorry.  I'm looking at a different

17   exhibit.  Let's turn to Page -- Exhibit 4, I apologize.

18       A.  It's okay.

19       Q.  This is a -- a page from your website, correct?

20       A.  Yes.

21       Q.  And it talks about the manage and mobility

22   modules, correct?

23       A.  Correct.

24       Q.  And here's where it says, the ETAdirect manage

25   module is the central hub for viewing and managing all

1    activities related to the mobile workforce, correct?

2       A.   Correct.

3       Q.   And along with providing these viewing options,

4    and I understand there are a variety of viewing options,

5    a Gantt chart and maybe perhaps a map that displays

6    technician status with a particular indication as to his

7    or her completion of the job; is that right?

8       A.   That's right.

9       Q.   This ETAdirect manage module allows the

10   dispatcher the functionality to drag and drop jobs

11   between field employees and/or put jobs back into the

12   routing bucket for automated routing and dispatch; is

13   that correct?

14      A.   That's correct.

15      Q.   And that is what is being used by Suddenlink,

16   correct?

17      A.   The ETAdirect Manage Module?

18      Q.   Yes.

19      A.   Yes, Suddenlink uses it.

20      Q.   And DISH, as well?

21      A.   Yes.

22      Q.   And that's occurring here in the -- in the

23   Eastern District of Texas?

24      A.   I know of Suddenlink.   DISH, I'm not aware

25   because it's a contractor of DISH.

1      Q.  Well, it's -- I'd like to visit with you a little

2   bit about the DISH relationship.  If you could flip back

3   to Exhibit 3, and Exhibit 3 has on Page 2 -- tell me

4   when you get to that page.

5      A.  Okay.

6      Q.  It talks about seamless integration.  Do you see

7   that?

8      A.  Yes.

9      Q.  Okay.  And the -- it -- it talks about the

10  clad -- cloud-based solution for mobile workforce,

11  talking about being easily configureable, quick to

12  deploy, upgrades and maintenance.  And then let me read

13  you this sentence, and let me know if I read it right.

14  Our system easily integrates with existing CRM and back

15  office system, including Convergys, CSG, and Amdocs

16  solutions.  Did I read that right?

17     A.  You did.

18     Q.  Okay.  So is it correct that part of what TOA

19  touts is its ability to integrate with CSG's CRM and

20  back office systems?

21     A.  That's correct.

22     Q.  And we talked a little bit about Mr. Little.

23  Now, you understand that Mr. Little worked for CSG

24  before he came over to TOA, right?

25     A.  Yes.

1    Q.  And TOA issued a press release when Mr. Little

2  was hired, correct?

3    A.  Correct.

4    Q.  TOA doesn't issue press releases for all its

5  employees, does it, that it new hires?

6    A.  That's right.

7    Q.  You've -- you've got to be somewhat important to

8  the organization to merit a press release, right?

9    A.  Right.

10    Q.  Take a look at Exhibit 16.  That's your company's

11  press release with respect to Mr. Little, correct?

12    A.  That's correct.

13    Q.  And when Mr. Little was hired, he was hired as

14  the vice president of strategic accounts, correct?

15    A.  Correct.

16    Q.  And he was to focus on establishing and

17  furthering strategic customer relationships, correct?

18    A.  Correct.

19    Q.  And he was tasked with leveraging his experience

20  to expand the client base for TOA, correct?

21    A.  Correct, his -- his connections.

22    Q.  Right.  And TOA knew that he formerly worked at

23  CSG and in particular worked as the product director for

24  CSG's Workforce Express product, correct?

25    A.  Correct.

1     Q.  That's a competitive product to TOA, correct?

2     A.  Correct.

3     Q.  So the Court had mentioned in some of its -- his

4  questions the nature of Mr. Little's knowledge having

5  been at CSG and then at TOA.  And is it your

6  understanding that -- that Mr. Little having been in

7  charge of the Workforce Express product from CSG would

8  have some understanding as to the integration of that

9  product or any product with the CSG customer care and

10  billing solution?

11     A.  He may have this understanding, but that's not

12  the integration that is mentioned in the documents that

13  you presented.

14     Q.  It's a different integration?

15     A.  Yes.  I can give you an example.  DISH Network,

16  our customer, uses CSG as their customer care and

17  bidding solution, and we have no access to CSG, even

18  though they're fully integrated.  The integration is

19  done by DISH Network.  We have what's called web

20  services, allows a user for a system to send data to our

21  solution and retrieve data from our solution.  And DISH

22  IT builds something called Middleware, and this

23  Middleware can send us data and can retrieve data, and

24  on the back end of this Middleware, they can send out

25  and retrieve from CSG.  That's how it works.

1    Q.  Does -- does TOA have any involvement in

2    developing the Middleware in terms of testing it to make

3    sure it works with its own system?

4    A.  No, the Middleware is developed and tested by our

5    customer.  What we provide is training documents that

6    explain how to use our API -- our -- our web services.

7    Q.  Okay.  So you provide some type of software, API

8    to DISH, they develop a Middleware, correct?

9    A.  That's correct.

10   Q.  Okay.  Let's take a look at Exhibit 5, Mr. Carmi.

11   This is a press release that talks about the DISH

12   deployment of TOA's ETAdirect Solution, correct?  Then

13   we -- correct?

14   A.  Correct.

15   Q.  And we've already established that includes not

16   just the routing and dispatch module, but also the

17   manage module, correct?

18   A.  That's correct.

19   Q.  And the mobility module?

20   A.  Yes.

21   Q.  And DISH -- the reason why they went with DISH,

22   or one of the reasons they went with TOA, right, was

23   they wanted to roll all of these modules out within the

24   ETAdirect Solution across all of its operations

25   nationwide, correct?

 1      A.  Correct.

 2      Q.  And I think you stated here -- or TOA states here

 3  that -- in the second paragraph that a wide range of

 4  DISH employees and third-party users, including field

 5  technicians, dispatchers, service representatives, and

 6  managers use ETAdirect, correct?

 7      A.  That's correct, but there's an important

 8  distinction maybe missed because it's a press release

 9  for marketing purposes.

10      Q.  I mean -- well, hold on a second.

11      A.  Oh, sure.

12      Q.  So there's a -- there's a misstatement in your

13  press release that's not accurate?

14      A.  Not a misstatement.  There is a -- a business

15  situation between DISH and the contractors.  They cannot

16  mandate the use of a system to a contractor because this

17  will be -- it's called co-employment.  This will break

18  the contractor-employee relationship, and, therefore,

19  DISH can mandate the use of our solutions for their

20  internal employees, can recommend using it by partners

21  and contractors.  Many of them use it.  They cannot

22  force them.  So -- so, in effect, there are some

23  contractors who don't use our solution, and there's no

24  way we can -- DISH can make them use the solution.  The

25  intention was definitely, as I said, to have them use

1   it, but there's no -- there's no enforcement mechanism.

2       Q.  I understand that.  Thank you.

3           If you look at the back end of this press

4   release, there's some links to additional information.

5       A.  Uh-huh.

6       Q.  One is -- and it's on Page 2 of Exhibit 5 -- a

7   Day in the Life of a DISH Network Technician Using

8   ETAdirect, and the other is a Mobile Workforce

9   Management in Action at DISH Network.

10          If you look at Exhibit 6 and Exhibit 7, are

11  those the two documents that you can click on your

12  website and go to?

13      A.  Are these the documents that sit behind those

14  links?

15      Q.  Yes.

16      A.  I assume so.  I don't know.  I haven't tried it,

17  but I assume so.

18      Q.  Okay.  And if we look at Exhibit 7, here we see

19  the -- a type of description of the integration of all

20  the modules within ETAdirect as being used by DISH,

21  correct?

22      A.  Correct.

23      Q.  For instance, we have the manage module, shows a

24  finger punching information into the computer, right?

25      A.  That's right.

1     Q.  We have the mobility, and that's the technician

2   holding the little device, right?

3     A.  Right.

4     Q.  We have the routing, capacity management,

5   forecasting, predictive customer communications, all of

6   that?

7     A.  Yes.

8     Q.  And in the center, it -- it has a circular

9   depiction of the supervisor, the technician, and the

10  dispatcher call center, all being united in what I

11  assume to be a successful customer appointment?

12    A.  Good, yes.

13    Q.  All right.  Glad I can understand your marketing

14  documents.

15    A.  Yes.

16    Q.  And this is how DISH intends and is using the

17  ETAdirect Mobile Solution, correct?

18    A.  That's a description of the -- of the modules

19  that they use in service of the customer experience.

20    Q.  Okay.

21    A.  Yes.

22    Q.  Take a look at Exhibit 8 in your notebook.  You

23  have that in front of you?  You have to audibly so the

24  court reporter can put it -- do you have that in front

25  of you?

```
 1              THE COURT:  You have to answer out loud.
 2     A.  Yes, I do.  Yes.
 3     Q.  (By Mr. Johnston)  This is an article that
 4 also -- also appears on your TOA website, correct?
 5     A.  Correct.
 6     Q.  If you look at the back, you've -- back end of
 7 the -- of the article, it's got your company stamp,
 8 correct?
 9     A.  You mean the company logo on the last page?
10     Q.  Right.
11     A.  Yes, that's correct.
12     Q.  And it shows Mr. Carlson on the front page of the
13 article, correct?
14     A.  Correct.
15     Q.  Mr. Carlson's the EVP of DISH Network, correct?
16     A.  Correct.
17     Q.  And you've met with him?
18     A.  I have.
19     Q.  In Denver, Colorado?
20     A.  That's right.
21     Q.  And Mr. Carlson is interviewed in this article
22 quite a bit, and I'd like to walk you through a couple
23 of the -- the quotations that are attributed to him and
24 ask you if those are similar sentiments that he
25 expressed to you, okay?
```

1     A.   Okay.

2     Q.   If you look at Page 4 of the article, below

3   The Value of Cloud-Based Software, the second paragraph,

4   where Mr. Carlson talks about intuitive user interfaces

5   and -- and device agnostic functionality being important

6   to DISH, he also states, quote, the key was also their

7   live demonstration, which showed us how the system would

8   work with DISH.  Did I read that right?

9     A.   Yes.

10     Q.   And that's something that he's shared with you,

11   as well?

12     A.   Yes.

13     Q.   And Mr. Hajibishi, who lives in the Dallas area,

14   was part of the -- part of the team that -- that

15   demonstrated the software to Mr. Carlson, correct?

16     A.   That's correct.

17     Q.   And part of his -- Mr. Hajibishi's job is to

18   demonstrate software to customers, right?

19     A.   That's correct.

20     Q.   Have you heard of the term "sales engineer"?

21     A.   Yes.

22     Q.   At this time, was Mr. Hajibishi's job title when

23   you showed the -- the software to Mr. Carlson, was his

24   job title sales engineer?

25     A.   I don't know what exactly his title was, but he

1    definitely functioned as a sales engineer.

2        Q.  And a sales engineer is -- isn't it a -- a person

3    who is technically savvy about your product's

4    functionality and operation, correct?

5        A.  Yes.  It's a person who is an expert in being

6    able to explain how the functionality of the product can

7    meet customer needs.

8        Q.  And they also -- they're not just kind of an

9    engineer person, they're also part of a sales group,

10   correct?

11       A.  In this function, absolutely.

12       Q.  They work hand-in-hand with the sales person --

13       A.  Yes.

14       Q.  -- when they go and talk to prospective

15   customers, correct?

16       A.  Correct.

17       Q.  And in this instance, Mr. Hajibishi demonstrated

18   the DISH software -- I'm sorry, the ETAdirect software

19   to Mr. Carlson in Colorado, and that was a key

20   decision -- that was a key factor in Mr. Carlson's

21   decision to go with ETAdirect, to your understanding?

22       A.  It was part of a very long process, including

23   many demonstrations, including demonstrations with

24   Mr. Hajibishi in Denver.

25            THE COURT:  Let me interject here a minute,

 1   counsel.  The Court has the morning scheduled for this

 2   evidentiary hearing, but not more time than that.

 3            MR. JOHNSTON:  I understand, Your Honor.

 4            THE COURT:  The pace is going to need to

 5   pick up.  I understand movants have two more witnesses

 6   and then you have a witness.

 7            MR. JOHNSTON:  I'll move it along.

 8            THE COURT:  Thank you.

 9   Q.  (By Mr. Johnston)  There are other Texas TOA

10   personnel who conduct similar customer demonstrations,

11   correct?

12   A.  That's correct.

13   Q.  That would be Mr. Somerville, correct?

14   A.  Correct.

15   Q.  And Mr. Meeks?

16   A.  Yes.

17   Q.  Now, Mr. Markus Remark is part of TOA's executive

18   leadership team, correct?

19   A.  Correct.

20   Q.  And I think you mentioned on your direct

21   examination that the senior folks generally have more

22   access to information than the lower employees, right?

23   A.  That's right.

24   Q.  And part of Mr. Remark's respondent --

25   responsibilities include overseeing customer

1   relationships, correct?

2       A.  Correct.

3       Q.  That would include overseeing your customer

4   relationship with DISH, correct?

5       A.  That's correct.

6       Q.  And Suddenlink, correct?

7       A.  That's correct.

8       Q.  Both of which have -- I'm sorry, both of which

9   are utilizing the ETAdirect Solution, correct?

10      A.  Correct.

11      Q.  If you look at that -- Exhibit 14, the leadership

12  team that talks about Mr. Remark having oversight over

13  presales, professional services, and customer care.  And

14  you flip over to Exhibit 15.  That's a fact sheet that

15  talks about TOA's professional services, correct?

16      A.  That's correct.

17      Q.  And does this accurately -- I -- I don't want to

18  go through it.  We can all read it, but does this

19  accurately describe what Mr. Remark's oversight duties

20  would entail, at least with respect to professional

21  services?

22      A.  It is not a description of Mr. Remark's duties.

23  It is a description of services to our office.

24      Q.  Professional services, right?

25      A.  Professional services, yes.

1    Q.  Now, you've been to visit Suddenlink here in the

2    Eastern District, correct?

3    A.  That's correct.

4    Q.  And you've visited them in Tyler, correct?

5    A.  That's right.

6    Q.  And you met with senior management of Suddenlink

7    in their Tyler office, correct?

8    A.  That's correct.

9    Q.  And the purpose of that meeting was to understand

10   how well the ETAdirect Solution was working for

11   Suddenlink, correct?

12   A.  The purpose was to maintain relationship with

13   Suddenlink executives on -- on my level, and that always

14   includes discussion of how well our solution works.

15   Q.  Right.  And you did -- like you said, there is

16   some discussion about the -- what is working, what might

17   not be working, what they might want to see in terms of

18   enhanced functionality?

19   A.  Yes.

20   Q.  All those kinds of topics are -- were -- were at

21   least addressed briefly at your meeting in Tyler,

22   correct?

23   A.  That's correct.  But this was for the entire

24   company nationwide, not specifically for Tyler.

25   Q.  Are you familiar with a man name Tim Imboden?

```
 1      A.  Yes.

 2      Q.  He's a former CSG employee that went to work for

 3  TOA, correct?

 4      A.  That's correct.

 5      Q.  And how about Rodney Glenn?

 6      A.  I'm familiar with Rodney Glenn.

 7      Q.  And Mr. Glenn is also a former CSG employee who

 8  went to work for TOA, correct?

 9      A.  Correct.

10      Q.  And we've talked about Mr. Little, correct?

11      A.  Correct.

12      Q.  All three of these gentlemen, Mr. Little,

13  Mr. Imboden, and Mr. Glenn, all three of these gentlemen

14  work on CSG's Workforce Express product, correct?

15      A.  I'm not sure.  I know that Rodney Glenn for

16  sure -- definitely worked.  I don't belive that Tim

17  Imboden and -- Tim Imboden and Rodney Glenn worked on

18  it.

19      Q.  Well, we'll -- we'll get to that.  Mr. Imboden

20  lives in Denver, right?

21      A.  Right.

22      Q.  And Mr. Glenn lives in Denver, right?

23      A.  That's right.

24      Q.  Mr. -- and Mr. Little works in -- or lives in --

25  in Denver, right?
```

```
 1     A.  That's right.

 2     Q.  You talked a -- you talked a little bit about the

 3   location of your -- your documentation.  Did we

 4   understand it correctly that the only document that's

 5   not -- that you know sitting here today that has not

 6   been scanned and uploaded to your cloud-based server is

 7   the notebooks that folks write down their notes in?  Did

 8   I hear that testimony correctly?

 9     A.  Yes.

10     Q.  So that would -- all the customer contracts would

11   be on your cloud-based server, correct?

12     A.  From 2011, for sure.  And prior to that, the

13   expectation has been val -- validated.

14     Q.  And the servers housing all of this documentation

15   are based in Miami, right?

16     A.  Miami, yes.

17     Q.  And they're managed by Mr. Turchyn's group in the

18   UK, correct?

19     A.  The servers that house the electronic copies of

20   TOA are managed by TOA IT Department from Cleveland.

21   Mr. Turchyn's group manages the production service.

22   It -- it provides service to our customers.

23     Q.  Okay.  So Mr. -- Mr. Turchyn's Ukrainian office

24   handles the -- the actual ETAdirect Solution production

25   to your clients?
```

1      A.  Correct.

2      Q.  That's managed from the UK -- or, I'm sorry, from

3   the Ukraine?

4      A.  Ukraine.  And we also have employees in Miami

5   that work on it, as well.

6      Q.  Right.  Do you have any concerns about the

7   historical integ -- integrity of your financial

8   information?  Do you have any concerns whatsoever

9   that -- that your financial information that is

10   currently on your books and records at TOA is somehow

11   not to be trusted?

12      A.  Do I have concern about the current financial

13   information that TOA has in its financial documents?

14      Q.  Right.

15      A.  No, I don't have concern.

16      Q.  How about historical financial information, do

17   you have any -- do you have concerns that that

18   information -- there's -- there's reason to believe that

19   needs to be called into question in terms of its

20   integrity and may not be correct information?

21      A.  No.

22      Q.  So sitting here today, all the financial

23   information that Mr. Cook has access to, he can verify

24   its accuracy, at least from your perspective, correct?

25      A.  That's correct.

1      Q.  Where is Cox Communications headquartered?

2      A.  In Atlanta, Georgia.

3      Q.  Is it safe to say that TOA represents itself to

4   be a global provider of workforce management?

5      A.  Yes.

6      Q.  And it has offices in the UK, the Ukraine, in the

7   States, and it has a number of employees who work

8   remotely, correct?

9      A.  Correct.

10      Q.  And when you mentioned earlier that some people

11   spend a week in the TOA office a month and then the rest

12   of the time they're on their -- on the road, I think you

13   mentioned Mr. Grainger?

14      A.  Yes.

15      Q.  And he submitted a declaration in support of

16   TOA's motion, correct?

17      A.  I believe so.

18      Q.  And he actually spends three quarters of his time

19   traveling or actually -- well, if you count travelling

20   to -- to the Ohio office, he might spend all of his time

21   traveling, but if -- if we just take the three weeks

22   that you mentioned that he's on the road, he's

23   traveling, right?

24      A.  Yes.

25      Q.  Traveling not from Cleveland but from North

1  Carolina?

2    A.  Correct.

3    Q.  From his house in North Carolina?

4    A.  Correct.  And sometimes in Cleveland.  It depends

5  where he is.

6    Q.  And similarly, Mr. Turchyn, I understand he --

7  his -- his -- he owns a home in -- in the Ukraine,

8  right?

9    A.  That's right.

10    Q.  Okay.  And he rents an apartment in -- in -- in

11  the Cleveland area, right?

12    A.  That's right.

13    Q.  Okay.  And he splits his time from the Ukraine

14  operation and the -- the -- the Cleveland operation,

15  right?

16    A.  That's right.

17    Q.  So he's traveling at least two weeks out of

18  the year -- two weeks out of the month from the Ukraine

19  to Cleveland, right?

20    A.  I don't exactly know the weeks, but on average,

21  he splits his time between those two locations.

22    Q.  Okay.  You went through a number of -- of

23  employees talking about who might have more knowledge

24  than the other person.  Is it fair to say, though,

25  Mr. -- Mr. Carmi, that with respect to Mr. Hajibishi, he

1   knows what he did with respect to DISH, right?

2      A.  Right.

3      Q.  And Mr. Remark has current ongoing job

4   responsibilities as it relates to both DISH and

5   Suddenlink, right?

6      A.  Right.

7      Q.  Both of whom use the ETAdirect Solution in the

8   Eastern District of Texas, right?

9      A.  Sorry, does DISH -- again, their contractor may

10  be using it.

11     Q.  What's the largest office that TOA has in terms

12  of number of employees sitting in that office globally?

13     A.  Globally?  It would be the Inbitec office --

14  I-n-b-i-t-e-c -- and that's one of the two subsidiary

15  companies we have in the Ukraine.

16     Q.  What city is that?

17     A.  It's called Kharkov.  It's K-h-a-r-k-o-v.

18     Q.  And there are roughly 150 employees in that

19  office?

20     A.  That's correct.

21     Q.  And that office is responsible -- the Ukrainian

22  office is responsible for all of the programming,

23  correct?

24     A.  You mean the -- the coding of the --

25     Q.  Yes.

```
 1      A.  -- solution?

 2      Q.  Yes.

 3      A.  That's correct, the coding is done there.

 4      Q.  By Ukrainian programmers, right?

 5      A.  That's correct.

 6      Q.  And we'll have an opportunity to talk to

 7  Mr. Turchyn a little bit more about that operation, but

 8  is it correct that it's your understanding that -- that

 9  the Ukrainian operation is responsible for programming,

10  for instance, and fixing software bugs that customers

11  might have?

12      A.  That's correct.

13      Q.  And programming enhancements to the ETAdirect

14  Solution, correct?

15      A.  That's correct.

16      Q.  And I think you mentioned that you, in the early

17  days of TOA, wrote the first version of the software,

18  right?

19      A.  That's right.

20      Q.  The Version 1.0, right?

21      A.  That's right.

22      Q.  And what version are we on now?

23      A.  4.4.

24      Q.  And between Version 1.0 and 4.4, the programming

25  for all of the functionality that's been added since
```

```
 1   then has taken place in the Ukraine, correct?

 2      A.  That's correct.

 3      Q.  Thank you.

 4            MR. JOHNSTON:  I don't have anything

 5   further.

 6            THE COURT:  Is there further direct from the

 7   Defendant?

 8            MR. ISACKSON:  I have a few points, Your

 9   Honor, if permitted.

10            THE COURT:  How long do you expect to take,

11   counsel?

12            MR. ISACKSON:  Five minutes.

13            THE COURT:  All right.  Proceed.

14                  REDIRECT EXAMINATION

15   BY MR. ISACKSON:

16      Q.  Mr. Johnston asked you a question about the

17   programming functionality being done in the Ukraine.

18   Where is the functionality that's being programmed

19   determined?

20      A.  The functionality is determined and designed in

21   the Beachwood headquarters in Ohio.

22      Q.  Now, Mr. Johnston also asked you about whether

23   you had concerns over the financial information

24   integrity at TOA from the historical information dating

25   from 2006 when the patent-in-suit issued.  When did
```

1   Mr. Cook join the company again?

2       A.   Six months ago.

3       Q.   And if there are concerns about the integrity of

4   the data, you had outside auditors for the company; is

5   that correct?

6       A.   That's correct.

7       Q.   And where are those auditors located?

8       A.   In Ohio -- Solon, Ohio.

9       Q.   The -- Mr. Johnston also made reference to a

10  meeting that you had with some Suddenlink people in

11  Tyler, Texas.  How many meetings did you have in Tyler,

12  Texas?

13      A.   One meeting.

14      Q.   And who attended that meeting?

15      A.   I was there with the TOA account manager in

16  charge of Suddenlink, and I met with the Suddenlink

17  executives that came from the St. Louis headquarter,

18  Andy Parrot, the VP of operations, and the IT people who

19  work for and with Andy.

20      Q.   Where are those Suddenlink executives

21  headquartered or based?

22      A.   They're based in St. Louis.

23      Q.   Where is Suddenlink headquartered?

24      A.   In St. Louis.

25      Q.   Where does TOA communicate with Suddenlink with

```
1    respect to the ETAdirect Routing Solution?

2       A.  In Wicker, Connecticut, with the St. Louis

3    company headquarter.

4       Q.  What contact have you had with any individuals

5    who work in that Tyler office since that one meeting?

6       A.  I had no contact with them.

7       Q.  What was your understanding as to why you were

8    asked to meet in Tyler, Texas?

9       A.  That's a common practice among our customers.  We

10   work with operations people, and they continuously

11   travel to meet their people in the field.  And when we

12   meet with them, we meet with them whenever they tell us

13   to meet them.  At that specific point, Andy Parrot asked

14   us to meet him in Tyler, Texas.

15      Q.  All right.  With respect to DISH, how many

16   contractors does DISH have around the country?

17      A.  I would say it's about three or 4,000

18   contractors.

19      Q.  Are the issues that Mr. Johnston mentioned with

20   respect to Southern Star here in the Eastern District of

21   Texas the same for all of DISH's contractors around the

22   country?

23      A.  What kinds of issues?

24      Q.  Well, the ones he mentioned about whether

25   Southern Star was using the ETAdirect and how they were
```

1    using it with respect to their mobility -- mobile

2    employees?

3       A.  It's the same situation.  DISH offered our

4    solution to the contractors, and it's up to them to

5    determine if they use it and how much.

6       Q.  Does DISH have contractors that operate within

7    the Cleveland metropolitan area?

8       A.  Yes, they do.

9       Q.  Do you know who they are?

10      A.  I don't remember the name, but they're a part --

11   Regional Service Department that operates out -- out of

12   Middle Ohio.

13      Q.  With respect to the demonstration that

14   Mr. Hajibishi was involved in with DISH, you mentioned

15   it was part of the team.  Who else was at that --

16   involved in that demonstration?

17      A.  Mr. David Troll, T-r-o-l-l, was the vice

18   president of sales for TOA.  I was there, and Mr. Yuval

19   Brisker, our company CEO, was there, as well.

20      Q.  Who was in charge of the demonstration for DISH?

21      A.  I was.

22              MR. ISACKSON:  No further questions.

23              THE COURT:  Further cross examination of

24   this witness?

25              MR. JOHNSTON:  No, Your Honor.

```
 1              THE COURT:  All right.  Counsel, when you

 2    address the Court, you need to stand.

 3              MR. JOHNSTON:  Yes, sir.

 4              THE COURT:  All right.  You may step down,

 5    Mr. Carmi.

 6              THE WITNESS:  Thank you.

 7              THE COURT:  The Court will take a

 8    five-minute recess.  The Court stands in recess.

 9              COURT SECURITY OFFICER:  All rise.

10              (Recess.)

11              COURT SECURITY OFFICER:  All rise.

12              THE COURT:  Be seated, please.

13              Defendants, call your next witness.

14              MR. MICALLEF:  Judge, before I call

15    Mr. Turchyn, I'd just like to note that Defendants

16    intend to produce Mr. Scott Dutton as part of our

17    case-in-chief.  I just wanted to clarify that.

18              THE COURT:  All right.

19              MR. MICALLEF:  So Plaintiffs -- or

20    Defendants would like to call Mr. Alexey Turchyn.

21              THE COURT:  If you'll come forward, sir.

22    The witness has been sworn.

23              You may begin your direct examination.  When

24    you're ready, counsel, please identify yourself for the

25    record.
```

```
 1            MR. MICALLEF:  My name is Ryan Micallef,

 2   Orrick, Herrington & Sutcliff, representing Defendant,

 3   TOA Technologies.

 4                     ALEXEY TURCHYN,

 5   having been first duly sworn, testified as follows:

 6                     DIRECT EXAMINATION

 7   BY MR. MICALLEF:

 8    Q.  Good morning, Mr. Turchyn.  Would you please

 9   state your full name and address for the record?

10    A.  My name is Alexey Turchyn, T-u-r-c-h-y-n.  I live

11   at 10510 Park Lane, Cleveland, Ohio.

12    Q.  And could you please tell the Court a little bit

13   about yourself, Mr. Turchyn?

14    A.  I was born and raised in Kharkov, Ukraine.  In

15   high school, I got fond of programming, so I selected

16   computer science and got a degree in applied mathematics

17   which was the closest that was that days in Kharkov --

18   from Kharkov University.  Graduated in 1994.  Got

19   married there, 22 years ago.

20            And since those day -- days, I was working

21   as a programmer, all managing IT for a couple of

22   Ukrainian original companies.

23            In 2000, I joined Maxbill, which is Israeli

24   company, where I met Irad Carmi, and I worked there up

25   to 2003 when Irad contacted me and says that he has
```

1  prototypes, and it's great idea, and he asked me to help

2  in developing this product.  And since that year, I am

3  with TOA.

4      Q.  Just so I understand, Mr. -- Mr. Turchyn, what is

5  your citizenship status?

6      A.  I'm a citizen of Ukraine, but in 2010, I got L1A

7  visa from -- sponsored by TOA, which is intracompany --

8  it was for international managers.  That was the year

9  when -- when I was promoted to be vice president of

10  technology of TOA Technologies, and I relocated to

11  Cleveland.  And now I'm working on green card sponsored

12  by TOA Technologies.

13      Q.  And just to make sure I understand, you moved to

14  Cleveland as soon as you became a vice president at TOA?

15      A.  That's right.  In 2010, I -- I moved to

16  Cleveland.

17      Q.  And you have a home in Ohio?

18      A.  That's right.

19      Q.  And how much of your time do you spend between

20  Ohio and other places?

21      A.  I spend most of time in Ohio working in our

22  headquarters, but as I manage our subsidiaries, I have

23  to travel.

24      Q.  Where do you pay taxes?

25      A.  I do pay taxes in Cleveland, Ohio.

1     Q.  And do you have any family there?

2     A.  Yes, I do.  I -- you know, I live with my son who

3   is -- goes also -- attends Case Western University in

4   Cleveland.

5     Q.  And you mentioned that you started at TOA as a

6   result of your work as Maxbill; is that correct?

7     A.  That's correct.

8     Q.  Could you spell that for the record, the name of

9   the company?

10    A.  Maxbill is M-a-x-b-i-l-l.

11    Q.  And what do you work on at TOA?

12    A.  I'm responsible for all the technological aspects

13  of TOA operations, for product architecture and design,

14  the development, meaning programming, royalty control of

15  our product, and technical operations.

16    Q.  Is that always -- is that -- excuse me, has that

17  always been what you worked on at TOA?

18    A.  Yes, that's right.

19    Q.  So what are your responsibilities as VP of

20  technology, broadly speaking?

21    A.  Pardon?

22    Q.  Broadly speaking, what are your responsibilities

23  as VP of TOA Technologies?

24    A.  All the technical aspects of what we do, design

25  the product, product development, and our technical

1    operations, technical side of it.

2       Q.  And could you provide the Court with a brief

3    overview of what ETAdirect is and what it does?

4       A.  ETAdirect is our product that helps our

5    enterprise clients to manage their mobile employees.

6       Q.  And do you make technical decisions about

7    ETAdirect?

8       A.  Absolutely.  I'm responsible for architecture and

9    technical design.

10      Q.  Do you consider yourself one of the people who

11   knows the most about the ETAdirect software?

12      A.  Absolutely.

13      Q.  Is there anyone else as familiar as you are with

14   the technical aspects of ETAdirect?

15      A.  There are a couple of people who are working for

16   me, but as I -- I -- I'm supervising them, and I'm

17   improving or making core decisions, probably I am the

18   most knowledgeable.

19      Q.  Does TOA have any employees in Texas who would be

20   as familiar as you are with the technical aspects of

21   ETAdirect?

22      A.  No.

23      Q.  Does TOA have any employees in Ohio who would be

24   as familiar as you are with the technical aspects of

25   ETAdirect?

1    A.  I'm in Ohio, and there's -- there's also

2  product -- product management function, people who grade

3  the requirements and define strategy, and they are in

4  Ohio.

5    Q.  I'm sorry, I didn't understand you.  People who

6  define --

7    A.  Product management function.  People who grade

8  requirements for the product and define strategy and --

9  and which features we need to add to the product.  Those

10  people are located in Ohio in our headquarters.

11    Q.  So is it fair to say that the ETAdirect product

12  is designed in Ohio?

13            MR. JOHNSTON:  Objection, leading.

14            THE COURT:  Objection is what, counsel?

15            MR. JOHNSTON:  Leading, Your Honor.

16            THE COURT:  This is before the Court.

17  I'll -- I'll allow some latitude in that regard.

18            Go ahead and answer the question.

19    A.  Product is -- requirements are graded in Ohio,

20  and functional design is done in Ohio.  Technical design

21  is done in Ukraine.

22    Q.  (BY MR. MICALLEF)  Let me take a slightly

23  different direction.  Where's the program done for the

24  ETAdirect product?

25    A.  Program is done in Ukraine.

1    Q.  Okay.  And who's actually writing the code?

2    A.  Program is employed by TOA's subsidiaries in the

3    Ukraine.

4    Q.  And how do they know what code to write?

5    A.  We -- they get -- we get functional requirements

6    from Cleveland, Ohio, office from product management

7    group.  And inside our subsidiary, we create technical

8    design which becomes a requirement for -- or tasks for

9    programmers.

10    Q.  And do you interact with these programmers

11    regularly?

12    A.  They report to me, directly or indirectly.

13    Q.  And by what means do you interact with the --

14    your group in the Ukraine?

15    A.  Physical presence or Internet, phone, Skype,

16    video conferencing.

17    Q.  Does any ETAdirect design or management happen in

18    Texas?

19    A.  No.

20    Q.  Are there any TOA employees in Texas who work on

21    or make decisions about the ETAdirect software from a

22    technical standpoint?

23    A.  No.

24    Q.  Would there -- would any TOA employees in Texas

25    be the best people to ask about technical aspects of

1   ETAdirect?

2     A.  No.

3     Q.  Would any employees in Ohio be the best people to

4   ask about technical aspects of ETAdirect?

5     A.  Yes, there are.  It's me and product management

6   group.

7     Q.  Mr. Turchyn, have you ever been to Texas for

8   work?

9     A.  No.

10    Q.  And I'd like to speak briefly about the

11  ETAdirect service.  Can you tell us which computers run

12  ETAdirect?

13    A.  ETAdirect is powered by -- or it runs on

14  TOA-owned service that are located in TOA operated data

15  centers in Miami -- Miami, Madrid --

16            THE COURT:  When you say Miami, you mean

17  Miami, Florida?

18            THE WITNESS:  Miami, Florida.

19            THE COURT:  Not Miami, Ohio?

20            THE WITNESS:  Sorry, Miami, Florida.

21    Q.  (By Mr. Micallef)  So that's Miami, Florida;

22  Madrid, Spain; and you said Denver, Colorado?

23    A.  That's right.

24    Q.  And where does ETAdirect provide service within

25  the United States?

1    A.  Our primary data center for U.S. clients is in

2    Miami, Florida.

3    Q.  And what's the purpose of having additional data

4    centers?

5    A.  We have secondary data -- data center just in

6    case for disaster recovery.  If something goes wrong

7    with the data center as a whole, then we can move our

8    operations in that case for -- in disaster -- for

9    disaster recovery.

10    Q.  And how do the end users of ET -- ETAdirect

11    access the servers?

12    A.  End users access ETAdirect through web browser.

13    Q.  And what kinds of end users does ETAdirect serve?

14    A.  Typically -- typical -- typically, we have mobile

15    employees, dispatchers, supervisor of mobile employees,

16    and CSRs, customer service representatives.

17    Q.  And those are the folks who would be using the

18    web browsers to access ETAdirect?

19    A.  That's right.

20    Q.  And where are all those users located?

21    A.  They can be located anywhere where Internet is.

22    We -- we don't apply any limitations we don't know.

23    We -- no -- no restrictions.  Any Internet connected

24    user can access our system.

25    Q.  Are there any servers located in Texas?

1    A.  No.

2    Q.  All right.  Mr. Turchyn, I'd just like to ask you

3  one more last question.  Of all the places in the United

4  States where TOA operates, where, including people's

5  brains, on paper, electronic form, where is the most

6  information available about ETAdirect?

7    A.  Beachwood, Ohio, our headquarters.

8    Q.  Thank you, Mr. Turchyn.

9         THE COURT:  You pass the witness, counsel?

10        MR. MICALLEF:  Yes, Your Honor.

11        THE COURT:  Cross examination.

12        MR. JOHNSTON:  Yes, Your Honor, just very

13  briefly.

14                   CROSS EXAMINATION

15  BY MR. JOHNSTON:

16    Q.  Good morning, Mr. Turchyn.

17    A.  Good morning.

18    Q.  I'd like to just follow up.  You're a citizen of

19  the Ukraine, correct?

20    A.  That's correct.

21    Q.  And prior to getting your visa in 2010, you

22  traveled to the United States for your work at TOA,

23  correct?

24    A.  That's correct.

25    Q.  And you did that on a business visa?

1      A.  That's correct.

2      Q.  Okay.  And that had some time restrictions as to

3  how much time you could spend in the United States,

4  correct?

5      A.  That's correct.

6      Q.  You own a home in -- in -- in the Ukraine,

7  correct?

8      A.  Yes.

9      Q.  That's where your wife lives?

10      A.  Apartment, yes.

11      Q.  That's where your wife lives, right?

12      A.  Yes, she still lives there, yes.

13      Q.  And she's a -- she's a Ukrainian citizen, right?

14      A.  We're in process of applying just -- but because

15  of the process, she has to be outside U.S.

16      Q.  Understood.  She's still a Ukrainian citizen?

17      A.  That's correct.

18      Q.  And your son is a Ukrainian citizen?

19      A.  That's correct.

20      Q.  You pay taxes in the Ukraine?

21      A.  No.

22      Q.  You only pay taxes in the U.S.?

23      A.  I only pay taxes in the U.S. since 2010.

24      Q.  Okay.  Before that, you're paying Ukrainian

25  taxes?

 1    A.  Before that, I was paying in Ukraine, that's

 2  right.

 3    Q.  Okay.  You mentioned that there were a couple of

 4  people who you supervised who have some pertinent

 5  knowledge about the ETAdirect Solution.  Who are those

 6  people?

 7    A.  Could you please clarify the question?

 8    Q.  Sure.  You had mentioned on your direct

 9  examination that there were a couple of people who you

10  supervised that had pertinent information about the

11  ETAdirect Solution.  Who are those folks?

12    A.  That's correct.  Most of the knowledge, I would

13  refer to -- to R&D, Research and Development Department

14  director.

15    Q.  What's his name?

16    A.  Mr. Sam Sandulenko -- Sam Sandulenko.

17    Q.  And where is he based?

18    A.  He's based in Ukraine.

19    Q.  And the other gentleman?

20    A.  Also -- the other departments that has knowledge

21  is the Implementation Department, and it is directed by

22  Mr. Boyko, B-o-y-k-o.

23    Q.  And where is he based?

24    A.  He's based in Ukraine.

25    Q.  And these are the departments that exist at the

1   TOA operation in the Ukraine?

2      A.  That's correct.

3      Q.  The Implementation Department and this -- I'm

4   sorry, what did --

5      A.  I mentioned Research and Development Department

6   and the Implementation Department, certain departments

7   where we develop software.

8      Q.  Okay.  And the Implementation Department is where

9   you develop implementation?

10     A.  That's correct.

11     Q.  Now, DISH is a customer of TOA.  We've talked

12  about them this morning.  You've heard about them here,

13  right?

14     A.  That's right.

15     Q.  They had some customer code developed as part of

16  their implementation, correct?

17     A.  That's correct.

18     Q.  And that code was developed in the Ukraine,

19  right?

20     A.  We have developed some code by Implementation

21  Department in Ukraine, that's correct.

22     Q.  Now, you mentioned the technical design

23  documentation that -- that is maintained in the Ukraine,

24  right?

25     A.  Technical design is done in Ukraine, that's

1  right.

2     Q.  And if -- there's also things called release

3  notes?

4     A.  Yes, yes, we do have some communication.

5     Q.  And that -- that documentation is developed by

6  Ukrainian programmers to describe, for lack of a better

7  word, what they're doing with the code in areas in the

8  ETAdirect -- ETAdirect Solution, correct?

9     A.  That's correct.

10    Q.  And if we had questions about a particular

11  release note written by a particular Ukrainian

12  programmer, is it fair to say we'd need to talk to that

13  Ukrainian programmer to understand what he or she meant

14  by their release note?

15    A.  The question is who should we talk or --

16    Q.  What would -- would that programmer be a

17  potential source of information as to what he or she

18  wrote in their release notes?

19    A.  The release notes combines information from

20  multiple programmers related to one release.  So we can

21  talk to multiple people, or we can talk to -- as a

22  product management or to management that leads technical

23  group to -- to get information.

24    Q.  And in terms of the Programming Department at --

25  at TOA's Ukrainian operation, who heads up that?

1     A.   Who heads -- who heads what?

2     Q.   Who heads up the -- the -- the Programming

3   Department --

4     A.   I understand.   There -- there are two

5   departments I mentioned.   One is research and

6   development.   This department is responsible for

7   ETAdirect -- for -- for core product development, and

8   Implementation Department is responsible for custom

9   development for our clients.

10     Q.   So --

11     A.   There are two departments that do development.

12     Q.   So we need to talk to Mr. Boyko or the other

13   gentleman --

14     A.   Sandulenko, Mr. Sandulenko.

15     Q.   -- about release notes, correct?

16     A.   That's correct.

17     Q.   The Suddenlink code, that was developed in the

18   Ukraine, that they're using, correct?

19     A.   They do use ETAdirect system which was developed

20   in the Ukraine.

21     Q.   The facility that TOA operates in the Ukraine

22   is -- I think you described it last week as almost 3,000

23   square meters big; is that correct?

24     A.   That's correct.

25     Q.   And I think you had mentioned in your deposition

1   last week that at least your ability to estimate a

2   number of offices that -- that TOA has in its Beachwood

3   office was around 15 or so?

4       A.  That was -- I -- I couldn't estimate square feet

5   or whatever of -- of Beachwood office.

6       Q.  It's significantly smaller than your Ukrainian

7   office facility, correct?

8       A.  I'm not sure what significantly -- it is smaller.

9       Q.  Okay.  And just to clarify for the Court, the

10  Ukrainian facility has a department that's dedicated to

11  maintaining the integrity of the server that actually

12  produces code that customers access from the server in

13  Miami, correct?

14      A.  That's correct.  We have a department called

15  Service Assurance.

16      Q.  And who heads up that?

17      A.  The head of it, Marina Chukhray, C-h-u-k-h-r-a-y.

18      Q.  And she's in the Ukraine?

19      A.  She's in Ukraine.

20      Q.  And you have a Quality Assurance Department, I

21  assume, in the Ukraine?

22      A.  That's correct, we also have --

23      Q.  And who heads up that?

24      A.  The head of it is Lyudmila Popova, P-o-p-o-v-a.

25              MR. JOHNSTON:  That's all I have.  Thank

1   you, Your Honor.

2                THE COURT:  Anything further of this witness

3   from the Defendant?

4                MR. MICALLEF:  Yes, Your Honor.  Just a few

5   questions.

6                THE COURT:  All right.  Is either side going

7   to need the overhead screen as a part of this

8   presentation?  If not --

9                MR. JOHNSTON:  No, Your Honor.

10               THE COURT:  -- we'll -- we'll lift it up and

11   avoid a hazard for lawyers going back and forth to the

12   podium.

13               MR. MICALLEF:  Much appreciated.

14               MR. ISACKSON:  Your Honor, I had planned, if

15   the Court will permit, to use one demonstrative in a

16   very short closing argument.  That would be the extent

17   of it, but we could dispense with that, as well.

18               MR. CHATTERJEE:  We could use the screen on

19   the table.

20               MR. ISACKSON:  Yeah, we could use -- we

21   don't need the overhead screen for that.

22               THE COURT:  Okay.  Then we'll put it up.

23               MR. MICALLEF:  Appreciate Your Honor's

24   concern for our safety.

25               THE COURT:  Lawyer safety is a primary

1    concern of the Court.

2                    MR. MICALLEF:  Safety first.

3                    THE COURT:  All right.  Proceed with your

4    questions.

5                    MR. MICALLEF:  Thank you.

6                         REDIRECT EXAMINATION

7    BY MR. MICALLEF:

8        Q.  Mr. Turchyn, you said your wife is in the process

9    of applying?

10       A.  That's correct.

11       Q.  And what did you mean by that?

12       A.  We -- we -- we use immigration lawyers that, you

13   know, run my process of -- of getting me, you know,

14   green cards, and there is a process that they would come

15   in to do and which documents to apply, what timing, and

16   other stuff.  So from that perspective, this is the most

17   optimal process for me.

18       Q.  Now, is it your family's objective to be together

19   in Beachwood?

20       A.  No, there are no objectives except just U.S.

21   immigration rules that, you know, have some limitations

22   while I'm in the process of application.

23                    THE COURT:  Can somebody tell me what the

24   relevance of his wife's location is and what they intend

25   to be in the future?  This is about venue here and now

1   and witnesses who will testify in this case, not their

2   spouses or their significant others.

3              MR. MICALLEF:  Understood, Your Honor.

4              THE COURT:  If there's some relevance, point

5   it out.  If not, let's move on.

6              MR. MICALLEF:  All right.  I -- I believe

7   this is relevant to establish Mr. Turchyn's permanence

8   in the United States and his intent to be in Ohio, as

9   opposed to a Ukrainian resident.

10             THE COURT:  Well, I think it's pretty well

11  established what his status is as of today.  What it may

12  be in the future is both speculative and probably very

13  tangentially, if at all, connected with the venue

14  analysis today.

15             MR. MICALLEF:  Understood.  That's all the

16  questions I have on that line.

17             THE COURT:  Okay.  Let's move on.

18             MR. MICALLEF:  Just a couple more, and we're

19  done.

20    Q.  (By Mr. Micallef)  Mr. Turchyn, would trial in

21  Ohio be more convenient for you?

22    A.  Pardon?

23    Q.  Excuse me.  Would trial in Ohio be more

24  convenient for you than trial here?

25    A.  Yes.

1       Q.  How far is your home from the courthouse in the

2   Northern District of Ohio?

3       A.  It's about 50 minutes of drive.

4       Q.  And do you believe it would be more convenient

5   for Ukrainian employees to come to Ohio?

6               MR. JOHNSTON:  Objection, speculation,

7   foundation.

8               THE COURT:  Sustained.

9               MR. MICALLEF:  That's all I have.

10              THE COURT:  All right.  Anything further

11  from the Plaintiff?

12              MR. JOHNSTON:  No, Your Honor.  Thank you.

13              THE COURT:  All right.  You may step down,

14  sir.

15              Do Defendants have additional witnesses?

16              MR. URIARTE:  Yes, Your Honor.

17              THE COURT:  Call your next witness then.

18              MR. URIARTE:  Defendants call Mark Baudek.

19              THE COURT:  If you'll come forward, sir.

20  This witness has been sworn; is that correct?

21              MR. URIARTE:  That's correct, Your Honor.

22              THE COURT:  All right.  All right, counsel,

23  proceed.

24              Please identify yourself for the record.

25              MR. URIARTE:  Robert Uriarte on behalf of

1    TOA Technologies.

2                          MARK BAUDEK,

3    having first been duly sworn, testified as follows:

4                          DIRECT EXAMINATION

5    BY MR. URIARTE:

6        Q.  Mr. Baudek, can you please state and spell your

7    full name for the record?

8        A.  My name is Mark Baudek, last name is B-a-u-d-e-k.

9        Q.  And what is your current occupation?

10       A.  I am a licensed private investigator with ICS of

11   Texas.

12       Q.  And how long have you worked for ICS of Texas?

13       A.  For one year.

14       Q.  Can you tell me a little bit about ICS?

15       A.  ICS was founded in Arizona in 1967 by David

16   Rabern, and his son, Michael Rabern, took over the

17   company approximately 14 years ago, and he's the

18   president.  And now ICS is currently in 11 states

19   throughout the country.

20       Q.  And can you please describe any training or

21   education you received from ICS?

22       A.  When I first started with ICS, I worked right

23   with the -- the owner and manager of the company, Lyndon

24   Lueders, and he taught me surveillance techniques, both

25   stationary and mobile.  He also taught report writing,

1   research, proper video, proper pictures, pretty much

2   everything you needed to do for the company.

3      Q.  Are you a licensed private investigator in the

4   state of Texas?

5      A.  Yes, I am.

6      Q.  And when did you obtain your license?

7      A.  Approximately a year ago.

8      Q.  And can you describe the process that led to

9   licensure?

10     A.  I'm licensed under ICS of Texas, and Lyndon

11  Lueders hired me and then trained me, and I'm licensed

12  through his company.  So my license is through ICS of

13  Texas.

14     Q.  Can you tell me what type of services you perform

15  for clients at ICS?

16     A.  We do everything from finding lost dogs to

17  criminal deconstruction cases, adultery, child custody

18  issues, locate individuals.

19     Q.  And -- and can you please tell me your

20  methodology for locating individuals?

21     A.  For locating, usually we start with online

22  searches.  We get the information, as much as we can

23  from the -- the client, and then we go online and find

24  out as much as we can.  We take LinkedIn, Facebook,

25  publicdata.com, county clerk's offices, and a company

1  called TLO, we use them, also.

2     Q.  And what exactly is TLO?

3     A.  TLO is -- Hank Asher started the company, and

4  he -- he has thousands of public and commercial

5  companies that he takes all their information from, puts

6  it together into one location, and makes a big database

7  so you can -- you can find people and find out pretty

8  much anything you want about them.

9     Q.  And is this a paid service?

10    A.  Yes, it is.

11    Q.  And is it pretty common in the industry for

12 private investigators to use TLO?

13    A.  Yes.

14    Q.  And can you just tell me a little bit more about

15 the types of public records that TLO accesses?

16    A.  They access as many as they can.  They get

17 property deeds, marriage licenses, birth certificates,

18 criminal records, utilities.  They -- they pretty much

19 access anything they can publicly that they can get

20 their hands on.

21    Q.  Please describe the general nature of your

22 engagement in this case.

23    A.  Our company was given a list of names, and we

24 were trying to verify where they currently live at.

25    Q.  And have you had this type of engagement -- you

1    personally had this type of engagement before in the

2    course of your employment?

3        A.  Yes, many times.

4        Q.  And have you successfully located individuals

5    using the methodology that we've just discussed?

6        A.  Yes, many times.

7        Q.  And how do you verify the -- the information you

8    research is accurate?

9        A.  Some clients just want an address back.  Other

10   ones will actually send someone on the ground to that

11   location and get video or pictures to verify they are at

12   that location.

13       Q.  And how long does it take to do a physical

14   verification?

15       A.  Usually it takes about a week.

16       Q.  Is the name Peter Koppstein familiar to you?

17       A.  Yes, it is.

18       Q.  And how is that name familiar to you?

19       A.  That was one of the names that you had given us

20   to research.

21       Q.  If you'll turn to what's marked as Exhibit 102 in

22   the binder in front of you.  And I'll ask you if you've

23   seen that document before, and can you just describe

24   what it is?

25       A.  Yes, I have seen this document before, and it's

1   one of the pieces that we used to locate this

2   individual.

3       Q.  Does this document form part of the basis of your

4   belief as to who Peter Koppstein is?

5       A.  Yes, it does.

6       Q.  Do you have an opinion regarding what

7   Mr. Koppstein's current occupation is?

8       A.  Yes, I do, and I did do a summary report, if I

9   can reference that.

10      Q.  The summary report you're referring to, would

11  that refresh your recollection as to what Mr. Koppstein

12  does?

13      A.  Yes, it would.

14              MR. URIARTE:  Your Honor, may I approach the

15  witness?

16              THE COURT:  You may.

17              MR. JOHNSTON:  Your Honor --

18              THE COURT:  Is there objection from the --

19              MR. PICKETT:  Yes, Your Honor.  We would

20  object just to the foundation, to hearsay, to the

21  relevancy of the testimony that -- that the witness is

22  trying to give concerning the verification of who this

23  particular person is.

24              THE COURT:  Well, we do need some predicate

25  as to who we're talking about and why they're relevant.

```
1           MR. URIARTE:  As to Mr. Koppstein?

2           THE COURT:  Yes.  I mean, if you want -- if

3   you want the Court to entertain this gentleman's

4   testimony as to a particular or potential witness in the

5   underlying case, then -- then we need to establish who

6   they are, what their knowledge is, why they're relevant

7   to the venue analysis that's provided before the Court.

8           And then if -- if had that predicate having

9   been laid there's a representation from the other side

10  that you believe is inaccurate and this gentleman can

11  speak to that factually, I'll hear him out, but until

12  there's some foundation as to relevance, I'm not

13  inclined to go a whole lot further with this witness.

14          MR. URIARTE:  Thank you.

15  Q.  (By Mr. Uriarte)  Mr. Baudek, can you please read

16  the title of Exhibit 102?

17  A.  Database and Expert System Applications.

18          MR. URIARTE:  And, Your Honor, we -- as a --

19  as just an offer of proof, this is a piece of relevant

20  prior art that we've located to date, and the relevance

21  is that Mr. Koppstein is a potential prior art witness.

22          MR. PICKETT:  Your Honor, we would object.

23  Again, there's no foundation, and it's strictly hearsay.

24  It's pulled down from some search engine, TLO.  This

25  witness has no direct knowledge.  He's got no specific
```

1   knowledge.  And so to that end, we would just object to

2   this type of testimony and evidence being presented to

3   the Court for purposes of this venue transfer analysis.

4               THE COURT:  Well, Mr. Pickett, you're

5   certainly going to have an opportunity to cross examine

6   this witness.  I'm going to allow the Defendant to go

7   further with it at this point.

8               But I -- I want you to establish your

9   relevance as quickly as possible.  So let's proceed.

10   Q.  (By Mr. Uriarte)  So going back to whether or not

11   you have an opinion as to what Mr. Koppstein's

12   occupation is?

13   A.  From my research, I can conclude that he is --

14               MR. PICKETT:  Your Honor, we're going to --

15   we're going to object again.  I mean, there's still

16   no -- there's still no predicate, and -- and I don't

17   want to continue to be disruptive, but by the same

18   token, I want the Court to respect that I'm requesting

19   the Court to just note our objections to there being no

20   foundation and no predicate for the opinion testimony

21   that this -- this witness is about to give to the Court.

22               THE COURT:  Well, I -- I'll sustain the

23   objection as to this witness' knowledge of what

24   Mr. Koppstein, whatever his name is, does or doesn't do.

25               I assume, counsel, that -- has there been

1   any -- let me ask it this way.  Is this line of

2   questioning a surprise to the Plaintiff, or has there

3   been discussion on a meet and confer basis about who the

4   target of this investigation is?

5              MR. URIARTE:  Your -- Your Honor, we

6   actually produced the prior art references that are in

7   the joint exhibit binder, and we had attempted to reach

8   a stipulation as to the location of these witnesses, but

9   we weren't able to agree on that.  And so that's why we

10  produced an investigator who's here to only testify

11  about the -- the location -- his opinion as to the

12  location of the authors of the prior art which

13  respectfully we submit is self-authenticating, and we do

14  have a bench memorandum if the Court -- if that would

15  aid the Court on ruling on the evidentiary objections.

16             MR. PICKETT:  Your Honor, to the best of my

17  knowledge, we've not seen this particular exhibit.

18             MR. JOHNSTON:  Let me speak to that.

19             MR. PICKETT:  Okay.

20             MR. JOHNSTON:  We received these exhibits

21  late Sunday evening, Your Honor, in the midst of -- of

22  preparing for the evidentiary hearing.  So it's safe to

23  say we have not had any opportunity to analyze and

24  review --

25             THE COURT:  Well, the problem I have is

1   this.  The underlying issue is apparently the location,

2   accessibility, and access to persons who the Defendants

3   are going to represent may be prior art witnesses, but

4   I'm sure you're not going to agree that they're prior

5   art witnesses and what they may or may not -- not know

6   is not relevant or ger -- germane to the issues in the

7   underlying patent infringement case.

8           And without more than the Defendant saying,

9   this is a prior art witness, I don't know how I can

10  accept that on its face without some specific foundation

11  being laid.  And this private investigator may have

12  personal knowledge of where certain individuals are or

13  are not, but he's certainly not able to lay that

14  foundation as to who is a viable prior art witness and

15  what they might or might not know about the state of the

16  art of the technology that's an underlying issue in the

17  case.

18          MR. URIARTE:  And -- and, Your Honor, the

19  only testimony --

20          THE COURT:  I mean, for all I know, you can

21  come up with 1,500 people that you say are prior art

22  witnesses, and this guy can tell me they're all over the

23  world.  That -- that's not something I can -- I can take

24  into account in a venue analysis.

25          MR. URIARTE:  Well, Your Honor, we -- we

```
 1    offer the testimony only to establish the -- the
 2    location of the authors of the prior art, which we would
 3    ask the Court to take judicial notice of, or at least
 4    admit it as it's in the joint exhibit binder.  And the
 5    Court can certainly review the references to see if --
 6    if it appears that there's any relevance to the
 7    technology at issue in this case.
 8                And -- and we respectfully submit that it's
 9    pretty clear from the -- the face of the documents
10    themselves that this is evidence that is prior art
11    evidence.  The location of these witnesses does bear on
12    access to witnesses who may testify about the state of
13    the art at the time the patents were issued, and the
14    testimony of our investigator is limited only to the
15    location of the authors of the prior art.  And I would
16    also add that we offered Mr. Baudek up for deposition,
17    and Plaintiffs declined that opportunity.
18                THE COURT:  Is there a response from the
19    Plaintiff?
20                MR. PICKETT:  Judge, we just continue to
21    stand on our objection.  We just don't think there's
22    foundation or predicate for this type of testimony from
23    this particular witness.  If he wants to testify --
24    according to what I've seen on the screen, this is the
25    location of this particular supposed prior art witness,
```

1  then that needs to be the extent of his testimony.  We

2  don't need to have exhibits, and we don't need to have

3  other things that have no foundation and have no

4  predicate, have no reliability or credibility upon which

5  the Court can rely to make the determination.

6         MR. URIARTE:  Your -- Your Honor -- may I be

7  heard, Your Honor?

8         THE COURT:  You may.

9         MR. URIARTE:  The Plaintiffs have already

10 agreed to the admission of these exhibits.  They're in

11 the joint exhibit binder.  And we do only intend to

12 offer this testimony as to -- to establish the location

13 of the prior art witnesses and -- and not as to the

14 extent of their knowledge or expertise.  We think -- we

15 think that's demonstrated by the -- the references

16 themselves, which, again, we submit are

17 self-authenticating.

18         And I do have some citations for Your Honor

19 if that would be helpful, as well as the bench memo.

20         THE COURT:  Well, I understand that there

21 are some tangible documents in the exhibit binder that

22 I've been given this morning, but the Court is not at

23 this juncture in this case in a position to determine

24 for itself what is and isn't prior art.  The Court

25 certainly isn't an infringement expert in this

1    particular field, and the Court itself does not stand in

2    the position today as one of ordinary skill in the art

3    who can evaluate these exhibits to determine whether

4    they are or are not relevant -- relevant prior art.

5            And so without -- without -- I mean, we're

6    talking about the president of the company.  We all know

7    that person's relevant.  We're talking about an

8    inventor.  We know that person is relevant to this

9    patent.  We're talking about an employee of one

10   competitor who is now working for another competitor, we

11   know that person is relevant.  But to stand up and give

12   me a name of somebody from who knows where and tell me

13   this is a viable prior art witness and you just have to

14   take my word for it, and, oh, by the way, here's the

15   person -- here's the private investigator who's going to

16   tell you that he lives next door to the courthouse in

17   Cleveland, Ohio, and it would be difficult for him to

18   come to Marshall, Texas, for venue purposes, I can't --

19   I can't accept that.

20           I'm going to -- I'm -- I'm going to find

21   that with regard to this line of questioning, there's

22   not been a proper foundation laid that would allow the

23   Court to consider this testimony because the Court's

24   been given nothing either by stipulation, expert

25   testimony, or any other source to establish that the

```
1    individuals who are the subject of this witness'
2    testimony are prior art witnesses or have relevant
3    knowledge of underlying disputes in this case.  They
4    have no -- as I'm aware of, they have no existing
5    connection with either party, and I don't have a basis
6    upon which to determine whether they're relevant
7    witnesses.  So where they live is something I can't
8    consider at this point.
9              MR. URIARTE:  And, Your Honor, could I just
10   add that we have not even received substantive
11   infringement contentions from Plaintiffs yet.  And so
12   we're in the position of having to survey the prior art
13   and make a good faith judgment on which references we
14   believe are going to be relevant.
15             THE COURT:  I understand, counsel.  But I
16   also understand that you've urged the motion to transfer
17   at this point in the -- in the litigation.  You've urged
18   the Court to stay the proceedings.  And the Court is
19   trying to accommodate your motion and take it up as
20   early as practical to both meet your demands and the
21   dicta infusion I owe because it's clear that the venue
22   determination should occur as early in the case as
23   possible, but that consequently means there are certain
24   things that aren't established yet.  And it's not a
25   perfect world.
```

1           And if we wait until they're established,

2    then we have allowed resources to be expended that may

3    have been wasted.  And it's a balancing test, and the --

4    the directives that this Court believes are binding upon

5    it from higher courts are we take these venue matters up

6    early rather than later.  And as a consequence of that,

7    there are just some things you don't know and the other

8    side doesn't know and I don't know.  And one of them is

9    whether these people this investigator looked around to

10   find out where they reside are relevant prior art

11   witnesses.

12          I don't know that, and you haven't shown me

13   that.  And until I know that, I don't think that this

14   witness' testimony is relevant.

15          MR. URIARTE:  May we at least put --

16          MR. PICKETT:  Thank you, Your Honor.

17          MR. URIARTE:  May we at least put the

18   addresses on the record?

19          THE COURT:  Again, you either have

20   predicate, or you don't have predicate.  Without

21   predicate, we just don't go there.  So unless you can

22   establish a predicate to establish that the persons whom

23   this witness is going to testify as to their location

24   and availability to testify at trial are valid and

25   viable witnesses as to the underlying disputes in the

1   case, we're not going to go any further.

2           MR. URIARTE:  And -- and so that I make sure

3   I understand the Court's guidance, would that predicate

4   consist of expert testimony establishing the relevance

5   of the prior art?

6           THE COURT:  I'm not going to define for you,

7   counsel, what you need to put on.  You're the movant.

8   It's your burden to prove that the proposed transfer of

9   venue is clearly more convenient.  I'm not going to

10  define for you the -- the parameters of what's

11  acceptable.

12          I am going to tell you, I have nothing

13  before me now that would establish the target of this

14  man's investigation to establish those persons as

15  relevant persons of knowledge relating to the underlying

16  disputes in this case.  And without that, I think his

17  testimony to go further is a waste of my time and

18  improper.  So I'm going to sustain the objection from

19  Plaintiffs.

20          MR. PICKETT:  Thank you, Your Honor.

21          THE COURT:  And unless this witness can

22  address what I've just laid out for you, I suggest we

23  pull him down and move on.

24          MR. URIARTE:  May I have just one brief

25  moment to confer?

```
 1            THE COURT:  You may.

 2            (Off the record discission.)

 3            MR. URIARTE:  Your Honor, if we were to list

 4  these prior art references as part of our prior art

 5  disclosures that are due 30 days in advance of trial,

 6  would that be sufficient to establish the relevancy?  If

 7  if so, we're prepared to -- to make an offer that we do

 8  intend to list these references.

 9            THE COURT:  The Court is going to consider

10  what's been filed as of the time I called the hearing to

11  order, so -- and they -- and whatever that is or isn't

12  was not before the Court when this evidentiary hearing

13  started.

14            MR. URIARTE:  Well, then, we have no further

15  questions from Mr. Baudek, Your Honor.

16            THE COURT:  Okay.  You may step down, sir.

17            THE WITNESS:  Thank you, Your Honor.

18            THE COURT:  Do Defendants have other

19  witnesses to call for this evidentiary hearing?

20            MR. CHATTERJEE:  Yes, Your Honor.  We would

21  like to call Mr. Dutton.

22            MR. JOHNSTON:  Your Honor, this is the first

23  I've heard that they were going to call Mr. Dutton in

24  their case-in-chief.  I had planned to call him in

25  our -- in our case.  It's a little bit unusual.  I was
```

1   planning on conducting a direct of him and letting them

2   have the opportunity to cross.  It -- it's up to you.

3            THE COURT:  It's -- it's their burden.

4   If -- if he's your witness and they want to call him

5   adversely, I don't see any reason why they can't do

6   that.

7            MR. JOHNSTON:  Sure, that's fine.

8            THE COURT:  Mr. Dutton, if you'll come

9   forward and take the witness stand.  You've been sworn,

10   correct?

11            THE WITNESS:  Yes, I have.

12            THE COURT:  You've been sworn?

13            THE WITNESS:  I'm sorry, yes, I have.

14            THE COURT:  Okay.  Have a seat, sir.

15            MR. CHATTERJEE:  Your Honor, for

16   Mr. Dutton, I've prepared a couple -- just a -- a binder

17   for the Court and for the witness with his deposition,

18   as well as prior testimony.  May I approach?

19            THE COURT:  You may approach.  Let's --

20   let's proceed, counsel.  Identify yourself for the

21   record, please.

22            MR. CHATTERJEE:  Thank you, Your Honor.  My

23   name is Neel Chatterjee, and I represent TOA

24   Technologies.

25                    SCOTT DUTTON,

```
 1   Having first been duly sworn, testified as follows:
 2                     DIRECT EXAMINATION
 3   BY MR. CHATTERJEE:
 4     Q.  Mr. Dutton, we just met briefly this morning.
 5   I'll introduce myself.  My name is Neel Chatterjee.  I
 6   appreciate you being here today.
 7           Now, just by way of introduction, you're
 8   currently employed by CSG, right?
 9     A.  That's correct.
10     Q.  And -- and your title is the director of product
11   management for Workforce Express?
12     A.  That's correct.
13     Q.  Now, are you the person charged with overseeing
14   this case for CSG?
15     A.  No, I'm not.
16     Q.  You're not.  You're -- you are the client
17   representative that's here today?
18     A.  Yes, sir.
19     Q.  And no one else is here on behalf of the company
20   other than your lawyers, right?
21     A.  That's correct.
22     Q.  And prior to the lawsuit, you -- you knew about
23   this lawsuit shortly before it was filed, correct?
24     A.  Shortly before it was filed, yes, I was.
25     Q.  And -- and -- and, in fact, shortly before the
```

1   lawsuit was filed, you reviewed the patents and you

2   mapped them to ETAdirect before this lawsuit was filed?

3      A.  Sorry.  Could you repeat that?

4      Q.  Sure.

5           MR. JOHNSTON:  I'll object to the extent

6   that calls for attorney-client work product.

7           MR. CHATTERJEE:  Your Honor, he answered it

8   in his deposition.

9           THE COURT:  Restate the question.

10          MR. CHATTERJEE:  Sure.

11     Q.  (By Mr. Chatterjee)  Prior to this lawsuit being

12  filed, you reviewed the patents that are in suit, and

13  you mapped them to ETAdirect, correct?

14     A.  I -- I reviewed the patents, correct?

15     Q.  And you mapped them to ETAdirect, right?

16     A.  I'm not sure what you mean by mapped to ETA or...

17     Q.  In the binder there, I have a -- a copy of your

18  deposition behind Tab A.  Didn't you say in your

19  deposition that you had actually mapped the patents to

20  ETAdirect?  I can point you to the page, if you'd like?

21     A.  Sorry?

22     Q.  I can point you to the page where you said it.

23     A.  Okay.

24     Q.  So if -- if you can take a look at Page 73.  It's

25  behind Tab A on Page 73, Line 6.  You were asked the

```
1    following question in your deposition on Line 6:  And

2    have you ever compared CSG's patents to ETAdirect?

3              Your first answer was, I'm not sure I can

4    answer that.  Right?

5       A.  Correct.

6       Q.  I -- I read your testimony correct?

7       A.  Correct.

8       Q.  And -- and then Mr. Uriarte, my colleague, said,

9    well, you can answer that yes or no.

10              And you said, yes.  Right?

11      A.  Correct.

12      Q.  That was your testimony?

13      A.  Correct.

14      Q.  And you said, and when was that?

15              Your response on Page 74 was, I'm sorry, I

16   can't give you -- a year ago.

17              And he said, before the lawsuit was filed?

18              And you said, oh, yes.  Right?

19      A.  Correct.

20      Q.  So you did compare the patents to ET -- ETAdirect

21   before the lawsuit was filed, correct?

22      A.  Correct.  I -- I read through our patents when we

23   received them.

24              MR. JOHNSTON:  I want to --

25              THE WITNESS:  Sorry.
```

```
 1              MR. JOHNSTON:  -- caution the witness.  To

 2    the extent that they're -- you're revealing the

 3    substance of -- of analysis that you were asked to do on

 4    behalf of the lawyers, I'd ask you to --

 5              THE COURT:  You can raise your objection,

 6    counsel, and I'll rule on it.

 7              MR. JOHNSTON:  Thank you.  It's...

 8              THE COURT:  I mean --

 9              MR. CHATTERJEE:  Is there an objection?

10              MR. JOHNSTON:  Well, I just -- the -- the

11    objection would be it's calling for attorney-client or

12    work product information.

13              MR. CHATTERJEE:  Your Honor, I'm just asking

14    what he did.

15              THE COURT:  Well --

16              MR. CHATTERJEE:  I'm going to move on

17    anyway, so...

18              THE COURT:  I was going to say, I don't see

19    the relevance of this as to venue.  We're -- we're not

20    here to have a mini trial, counsel, on the underlying

21    case-in-chief.  We're here to decide venue.  And I'd

22    like to confine the examination to those issues.

23              MR. CHATTERJEE:  Then I'll move to that

24    exact issue, Your Honor.

25              THE COURT:  Please do.
```

1       Q.  (By Mr. Chatterjee)  So now in -- in filing its

2   lawsuit here in Marshall, Texas, CSG decided that this

3   is a more appropriate forum than Denver where CSG's

4   headquarters are, right?

5       A.  Yes, I guess so.

6       Q.  And -- and -- and isn't it fair to say that the

7   reason that CSG sued TOA here was to forum shop?

8       A.  I -- I can't answer that.  I was not involved in

9   the decision as to where that was -- where it was filed.

10      Q.  Okay.  Well, let -- let's explore that issue.

11  You're very knowledgeable about the Workforce product,

12  right?

13      A.  Correct.

14      Q.  And the Workforce product is a product that

15  competes with ETAdirect, right?

16      A.  It does.

17      Q.  At least in some areas?

18      A.  Yes.

19      Q.  Okay.  Now, the -- the key facilities, the

20  business offices, the places where things are done for

21  Workforce are all outside of the Eastern District of

22  Texas, correct?

23      A.  Correct.

24      Q.  And you've never been to Marshall before, right?

25      A.  I have not been to Marshall, no.

1    Q.  The -- the only place that -- that you've been to

2    in the Eastern District of Texas was to meet with a

3    customer in Plano?

4    A.  Correct, yes.

5    Q.  And you don't work here?

6    A.  In -- in Marshall?

7    Q.  Or in the Eastern District of Texas?

8    A.  Or the Eastern District, no, I do not.

9    Q.  And you don't live in this district?

10   A.  I do not.

11   Q.  When you had your deposition taken, it was taken

12   in Denver, right?

13   A.  It was.

14   Q.  And isn't it true that the only CSG office in

15   Texas that -- that -- well, isn't it true that the only

16   CSG office in Texas does nothing specific to Workforce

17   Express?

18   A.  Correct.  We have a print facility.  There's

19   actually two locations.  One I'm not sure is a physical

20   office.  It is a sales person in San Antonio, and we

21   also have a print and mail facility in Coppell, Texas.

22   Q.  Right.  And that print and mail facility in

23   Coppell, Texas, is just a -- it's a -- it's not anything

24   particular to Workforce, right?

25   A.  It's related, but not particular to it, correct.

1    Q.  Now, you've seen the ETAdirect product before,

2  right?

3    A.  I have.

4    Q.  You saw it at Cable Vision's offices?

5    A.  Correct.

6    Q.  Was it their headquarters?

7    A.  Yes, I believe it was.

8    Q.  Now, when -- when you saw the ETAdirect product,

9  was it here in the Eastern District of Texas?

10   A.  No, it was not.

11   Q.  Was it in Texas at all?

12   A.  When I saw it?

13   Q.  Yes.

14   A.  The place that I -- location I saw it?  No, it

15  was in the New York or --

16   Q.  In fact --

17   A.  -- Long Island.

18   Q.  -- have you ever seen the ETAdirect product in

19  Texas?

20   A.  I have not.

21   Q.  The place where you saw it was in New York,

22  correct?

23   A.  Correct, yes.

24   Q.  Are you aware of anybody in the Eastern District

25  of Texas who pays taxes that is in some way associated

1   with the Workforce Direct prod -- or the Workforce

2   product?

3       A.  An employee of CSG related to Workforce that pays

4   taxes in the Eastern District?

5       Q.  Yes.

6       A.  No.

7       Q.  Now, there are a number of customers that you've

8   heard discussed today.  I think Suddenlink was one of

9   them, DISH was another.  I talked about Cable Vision.

10  Do you recall that?

11      A.  I'm sorry?

12      Q.  Do you recall that?  Do you remember hearing all

13  that testimony?

14      A.  Yes, I remember.  Yes.

15      Q.  And you at -- at your company, you had a role

16  where you were kind of one of the -- the point people at

17  CSG for Comcast, right?

18      A.  Correct.

19      Q.  And your primary interactions with Comcast were

20  with their headquarters?

21      A.  That's not correct.

22      Q.  Okay.  You -- you worked a lot with people in --

23  in Philadelphia which is where Comcast was based, right?

24      A.  I did, yes.

25      Q.  And -- and is it common in this industry that

1    when -- when you're -- you're dealing with these kind of

2    institutional relationships, that you're working with --

3    with companies at their headquarters?

4        A.   Partially.

5        Q.   And you visit the customer sites, too, on

6    occasion?

7        A.   Absolutely.

8        Q.   All over the country?

9        A.   Absolutely.

10       Q.   Now, you have stated before that there are two

11   CSG customers that are in the Eastern District of Texas,

12   right?

13       A.   Correct.

14       Q.   And -- and one of them is -- is -- is it DISH?

15       A.   Dish Networks.

16       Q.   And -- and does Dish Networks use the Workforce

17   product in the Eastern District?

18       A.   They do not.

19       Q.   And you also mentioned Time Warner Cable?

20       A.   Correct.

21       Q.   Does Time Warner Cable use the Workforce product?

22       A.   Today?

23       Q.   Yes.

24       A.   No.

25       Q.   No.  Does Time Warner Cable use my client's tool?

1     A.  Not to my knowledge.

2     Q.  Do --

3     A.  Yes -- excuse me, they do -- I believe in the

4  Carolinas, they are using the software in the Carolinas.

5     Q.  Okay.  Well, let me ask a little more precise

6  question on that.  Time Warner Cable does not use my

7  client's product in Eastern District of Texas, to the

8  best of your knowledge, correct?

9     A.  To the best of my knowledge, no.

10    Q.  And, in fact, to the best of your knowledge, they

11 don't use it in Texas at all, correct?

12    A.  Correct.

13    Q.  Now, you also -- we talked briefly about Comcast.

14 Now, CSG has a sales team that works with -- work with

15 Comcast, right?

16    A.  Correct.

17    Q.  And the Comcast sales team is in Denver, Omaha,

18 Philadelphia, and Atlanta, right?

19    A.  That is correct, yes.

20    Q.  They're not in the Eastern District of Texas?

21    A.  Correct.

22    Q.  They're not anywhere in Texas?

23    A.  Correct.

24    Q.  Now, is it fair to say that the -- the -- the

25 technical details of CSG's Workforce product, as well

1    as its financial information, is not generally located

2    here in Texas or in the Eastern District of Texas?

3       A.  Not to my knowledge, no.

4       Q.  Okay.  Thank you.

5              MR. CHATTERJEE:  No further questions, Your

6    Honor.

7              THE COURT:  All right.  Examination of this

8    witness by the Plaintiff?

9              MR. JOHNSTON:  Very briefly.

10             THE COURT:  I assume, counsel, this is the

11   Defendant's last witness?

12             MR. CHATTERJEE:  Yes, Your Honor.

13             THE COURT:  All right.  You may proceed.

14             MR. JOHNSTON:  Lee Johnston on behalf of CSG

15   System.

16                    CROSS EXAMINATION

17   BY MR. JOHNSTON:

18      Q.  Good morning, Mr. Dutton.

19             THE COURT:  If you'll speak up a little bit,

20   counsel.

21      Q.  (By Mr. Johnston)  Can you hear me, Mr. Dutton?

22      A.  I can now.

23      Q.  You have a -- some hearing aids.

24      A.  I have hearing aids --

25      Q.  I apologize.

1      A.  -- yes, in both ears.

2      Q.  Didn't get a chance to do this, but could you

3  introduce yourself to the Court and let the Court know

4  how you're employed, what you -- what your job duties

5  are at CSG?

6      A.  I'm the director of product management at CSG,

7  specifically for Workforce Express.

8      Q.  And CSG offers products beyond Workforce Express,

9  correct?

10     A.  Correct.  We have a number of products and -- and

11  the products lead across the company.

12     Q.  And one of those products is -- is for the

13  customer care and billing solution, correct?

14     A.  That's correct.

15     Q.  And that's -- when you mentioned earlier DISH

16  being a customer of CSG in the Eastern District of

17  Texas, they're using CSG's customer care --

18     A.  Yes, they are.

19     Q.  -- and billing system, right?

20     A.  That's correct.

21     Q.  Okay.  As the product manager, do you have

22  familiarity with the -- the overall marketing of the

23  Workforce Express product?

24     A.  Yes, I do.

25     Q.  And is it correct that CSG attempts to market its

```
1   Workforce Express product to existing customers who are

2   using its customer care and billing solution?

3       A.  Yes, we do.

4       Q.  And that would include DISH, right?

5       A.  That's correct, yes.

6       Q.  And as well, CSG markets to folks who are not

7   using either solution?

8       A.  That's correct, yes.

9       Q.  And that would include Suddenlink, correct?

10      A.  That's correct.

11      Q.  Now, counsel questioned you earlier about your

12  meetings with Comcast.  When did those meetings take

13  place, and what was the nature of your --

14      A.  I'm sorry?

15      Q.  What was the nature of your meetings in -- in --

16  at Comcast in Plano?

17      A.  The nature of my meetings at Comcast in general?

18      Q.  Yes.

19      A.  Gosh, we -- Comcast is a -- is a user of

20  Workforce Express.  We meet with the senior operations

21  people, senior leadership in the company at both a

22  corporate level and division level.  And we also meet

23  with the front line workers, technicians, routers,

24  dispatchers at the operational or local level, as well.

25      Q.  And is one of the local levels of Comcast that
```

1    you mentioned in Plano?

2       A.   They -- yes, they -- they were in Plano.   That

3    has since become Time Warner Cable.

4       Q.   Okay.

5       A.   That operation.

6       Q.   And --

7       A.   So it used to be Comcast at one time.

8       Q.   And you've actually met with dispatchers using

9    the Workforce Express product in the Eastern District of

10   Texas?

11      A.   I have.   I've spent quite a bit of time in Plano

12   with technicians, third-party contractors, dispatchers,

13   routers, capacity planners, and local technical

14   operations people.

15      Q.   Have you actually ridden in a truck with a

16   technician?

17      A.   I've ridden in a truck in Plano, Texas.

18      Q.   Does CSG have any employees based in Texas?

19      A.   We do.   We have a sales person, Reed Jenkins, in

20   San Antonio.

21      Q.   What does Reed do?

22      A.   Reed is a -- I'm not sure of his title.

23               THE COURT:   Again, let's refer to

24   individuals by complete names, not just first names.

25               MR. JOHNSTON:   I apologize, Your Honor.

```
 1              THE WITNESS:  I'm sorry.
 2     Q.  (By Mr. Johnston)  What does Mr. Jenkins do?
 3     A.  He is a sales person.  I -- I'm -- I'm not sure
 4  if he goes by business development or account manager,
 5  but he is -- is sales.
 6     Q.  Do any of his job responsibilities include sales
 7  for CSG's Workforce Express product?
 8     A.  Yes, it does.
 9     Q.  Could you identify CSG's customers who have
10  operations in Texas for us, please?
11     A.  In Texas?
12     Q.  Yes.
13     A.  We have Comcast, Time Warner, DISH Networks, and
14  Grande Communications.
15     Q.  Also Charter?
16     A.  Excuse me, and Charter, yes, you're right.
17     Q.  Any others?
18     A.  Not that I can recall.
19     Q.  And you mentioned that Time Warner until recently
20  utilized the Workforce Express product in the Eastern
21  District?
22     A.  Correct.
23     Q.  When did that cease?
24     A.  In -- in Texas, they're actually the last Time
25  Warner market to convert to another competitor's
```

1   product.  That was last year.

2       Q.  Okay.  Has CSG lost business to TOA for cable

3   and -- and telecomm companies who service the Eastern

4   District of Texas?

5       A.  Yes, we have.

6       Q.  Could you identify those, please?

7       A.  The Suddenlink and DISH Networks.

8       Q.  And is it correct that when CSG was marketing its

9   services to DISH, it came up with an estimate as to the

10  number of licenses that would be needed by DISH to serve

11  its mobile -- mobile field workforce?

12      A.  Yes.  We typically have a ratio of a thousand --

13  what we call subscribers or our customer's customers

14  would be equivalent to one technician.

15      Q.  And how many licenses or how many technicians did

16  you estimate DISH would need?

17      A.  12,000 across the country.

18      Q.  And based on that information, do you have an

19  understanding as to the number of DISH subscribers in

20  the Eastern District of Texas?

21      A.  I do, 234,350.

22      Q.  And you -- that's information you know because

23  CSG operates the customer care and billing solution for

24  DISH, right?

25      A.  We have those customers in our -- in our --

1    excuse me, in DISH's subscriber database for which we --

2    we manage, yes.

3        Q.  And that would translate to roughly 234 mobile

4    technicians per your formula?

5        A.  Roughly, yes.

6        Q.  And those technicians would be serving customers

7    in the Eastern District of Texas?

8        A.  Yes, that's correct.

9        Q.  And as we heard earlier this morning, those are

10   mobile technicians using the ETAdirect Solution?

11       A.  I would suspect they are, yes.

12           MR. CHATTERJEE:  Move to strike for

13   speculation, Your Honor.  He just said, I -- I suspect

14   they are.

15           MR. JOHNSTON:  Sure.

16           THE COURT:  I'll -- I'll sustain the

17   objection.

18       Q.  (By Mr. Johnston)  Can you tell me if you know or

19   have heard of the name Cliff Harrison -- Clifford

20   Harrison?

21       A.  Yes.  Cliff was one of the inventors of our

22   patents.

23       Q.  How about --

24           THE COURT:  Mr. Dutton, this -- three times

25   in this hearing this morning I've instructed everybody

1   present not to use first names only.

2                THE WITNESS:  I'm sorry.

3                THE COURT:  You just called him Cliff.

4                THE WITNESS:  I'm sorry.

5                THE COURT:  Now, if anybody ignores my

6   instruction again, there are going to be consequences,

7   and everybody -- pretty much everybody in the room has

8   been guilty of it.  I don't want individuals referred to

9   by first name only.  I believe it's confusing and

10  creates the potential for confusion in the record.  I

11  want individuals referred to by complete names or by a

12  last name with either Mr. or Ms. at the beginning.  If

13  there's any doubt about that, somebody let me know.

14  Otherwise, there will be consequences if this

15  instruction is ignored again.

16                All right.  Proceed.

17  Q.  (By Mr. Johnston)  Are you familiar with a man by

18  the name of Phillip Bush?

19  A.  Yes, I am.

20  Q.  Who is he?

21  A.  He is a -- one of the inventors of our patent --

22  patents.

23  Q.  Are you familiar with a gentleman by the name of

24  Emery Weber?

25  A.  Yes.  He's also an inventor of the patents.

1    Q.  And where do these gentlemen --

2    A.  I'm sorry?

3    Q.  Where do these gentlemen reside?

4    A.  To the best of my knowledge, in Denver, Colorado.

5         MR. JOHNSTON:  Thank you, Your Honor.  I

6    have no further questions.

7         THE COURT:  All right.  Further examination

8    of this witness by the Defendant?

9         MR. CHATTERJEE:  Yes, Your Honor, just a few

10   questions.

11              REDIRECT EXAMINATION

12   BY MR. CHATTERJEE:

13   Q.  Mr. Dutton, you outlined a -- a number of

14   companies that -- that do business in Texas.  You

15   mentioned DISH, Charter Communications, Grande -- I

16   think it was called Grande?

17   A.  Grande, correct.

18   Q.  I think you also mentioned Comcast; is that

19   correct?

20   A.  Correct.

21   Q.  Now, all of those companies, they do business all

22   over the country, right?

23   A.  I'm sorry?

24   Q.  They do business all over the country, right?

25   A.  Grande is -- is Texas-based.  But the other four

 1   companies do -- do do business across the country.

 2       Q.  Does Grande do business in Eastern District of

 3   Texas?

 4       A.  I -- I am not sure.

 5       Q.  And how many -- how many total customers does CSG

 6   have?

 7       A.  Total customers?

 8       Q.  Yes.

 9       A.  We -- we talked about that in the deposition.

10   It's -- two years ago CSG bought another company called

11   Intech Telecomm, and I'm not as familiar with their

12   customer base.  They have approximately 500 customers

13   around the world.  How many are in the U.S., I don't

14   know.

15       Q.  Excluding --

16       A.  Legacy, CSG, more than 25, less than a hundred.

17   I'm just not sure exactly, you know, the number.

18       Q.  And you talked about going with a -- a dispatcher

19   in -- in Plano.  You -- you do those meetings with

20   dispatchers --

21       A.  I do.

22       Q.  -- all over the country, right?

23       A.  I do.

24       Q.  Your -- your meeting in Plano, you don't mean to

25   suggest that that meeting in Plano was somehow unique or

1  different from what you do with anyone else anywhere --

2  anywhere else in the country?

3      A.  No, it was not unique.

4      Q.  You also talked about the -- the level of

5  activity of -- of DISH Network.  I -- I wrote down

6  this -- I think a 234,000 person number?

7      A.  That's correct.

8      Q.  And that's the number of DISH users in Texas?

9      A.  That would be the number of DISH subscribers,

10 that's correct.

11     Q.  Did you invest -- did -- how did you find that

12 out?  Did you investigate it in the ETA -- I mean, in

13 the Workforce system?

14     A.  Well, no.  Because we have the customer database,

15 in our -- in our environment, our server environment, I

16 determined the -- the Zip Codes for the Eastern District

17 of Texas, and we did a query on the database to

18 determine the number of subscribers.

19     Q.  Did you do anything to determine the number of

20 subscribers in Ohio?

21     A.  I did not.

22     Q.  Do -- do you know the total number of DISH

23 subscribers there are around the country?

24     A.  To the best of my knowledge, about 12 million.

25     Q.  And is the services, to the best of your

1   knowledge, that are given with respect to the Workforce

2   solution any different for the Texas -- the 234,000

3   users in Texas than the other 12 million around the

4   country?

5       A.  I don't believe there's any difference, no.

6       Q.  Now, you talked about the -- the one employee

7   that you said might have involvement in Workforce

8   Express that lives in San Antonio?

9       A.  Correct.

10      Q.  Could you remind me what his name is?

11      A.  Reed Jenkins.

12      Q.  Mr. Jenkins.  So do you have a sense of the

13  volume of work or of -- of activity that Mr. Jenkins

14  does with respect to Workforce Express?

15      A.  The -- the volume of his or percentage of his

16  work that he spends on Workforce?

17      Q.  Correct.

18      A.  I -- I could only guess.  I'm not sure you want

19  me to guess.

20      Q.  Yeah, I don't want you to speculate.

21      A.  No.

22      Q.  If you know, you know.

23      A.  Certainly I have worked with Reed --

24          THE COURT:  Mr. Dutton --

25      A.  Excuse me, Mr. Reed Jenkins very specifically on

1   Workforce Express accounts.

2      Q.   (By Mr. Chatterjee)  But you don't have a sense

3   of -- of how big a role that is in his life?

4      A.   I -- I do not.

5      Q.   All right.  Thank you very much.

6            MR. CHATTERJEE:  No further questions, Your

7   Honor.

8            THE COURT:  You may step down.

9            Defendants have indicated that they have no

10  further witnesses to call.  Is there anything further

11  from the Defendants?

12           MR. ISACKSON:  Your Honor, we would propose

13  a short argument, if the Court will entertain it.

14           THE COURT:  Well, I'm going to see if the

15  Plaintiffs have witnesses to call.  Once we've completed

16  all the evidence, then I'll hear a short closing.  So

17  you're telling me other than your closing argument, you

18  don't have anything further?

19           MR. ISACKSON:  That, as well -- as the

20  Court's aware, we've already filed a stipulation, and

21  we'd ask that that be entered and considered.

22           THE COURT:  All right.  Do Plaintiffs have

23  any additional witnesses to call, Mr. Dutton having been

24  examined?

25           MR. JOHNSTON:  No, Your Honor.

```
 1              THE COURT:  All right.  All right.  Counsel,
 2    I'll afford both sides five minutes for a brief summary
 3    closing.
 4              Movants may go first.
 5              MR. ISACKSON:  Thank you, Your Honor.
 6              Very briefly, we believe that the evidence
 7    that's been presented supports that it's clearly more
 8    convenient that this trial happen in the Northern
 9    District of Ohio than in this Court.
10              When you consider all of the access issues
11    with regard to key sources of proof, Beachwood, Ohio, is
12    center of the case with TOA in view of the clear
13    convenience of the TOA employees who work in that area
14    or frequently visit that office, whether it's from
15    within this country or outside the United States.
16              We've identified several non-party witnesses
17    located in the Ohio area whose testimony may be highly
18    relevant to the issue of damages, laches, and
19    hypothetical negotiation, given that the financial
20    situation of TOA since January of 2006 would be
21    relevant.  That's when the first patent-in-suit issued.
22              We've also established that TOA has outside
23    auditors in case any issues with regard to the accuracy
24    or veracity of the financial data of TOA are located in
25    Ohio.
```

1          Also, with regard to CSG's argument in the

2    briefing that prosecuting attorneys are not relevant, we

3    submit that's incorrect.  At this point in the case,

4    it's an early phase, no discovery has happened.  Under

5    good authority, investigation into inequitable conduct

6    is clearly fair under the Leader Tech versus Facebook

7    case in the District of Delaware, and I have the cite if

8    the Court would like that, which permits discovery into

9    inequitable conduct.  Also, the prosecuting attorneys

10   were located in Chicago and New York are relevant to the

11   issues of prosecution history estoppel and laches which

12   will become important in this case.

13          The party is a Delaware corps, there's no

14   meaningful connection to the Eastern District of Texas.

15   There are no offices.  There are no employees.  There

16   are no documents.  There are no witnesses in this

17   district.  The only witnesses that exit in Texas are

18   located outside the district.  And under the Voxpath

19   case, they're not relevant to the venue calculation.

20          TOA's employees who live in Texas have no

21   significant knowledge under the Network Protection and

22   Voxpath cases.  They're not critical to this case.

23   There are employees in Ohio that have more knowledge and

24   better knowledge and certainly at least equivalent

25   knowledge.

 1          TOA's customers do business all over the
 2    country.  None of them are headquartered in Texas.
 3    There's no special connection between the Eastern
 4    District of Texas and the issues in this case.
 5          In short, there's no source of proof that's
 6    more easily accessible in the Eastern District of Texas,
 7    and we submit this factor of access weighs heavily in
 8    favor of the transfer.
 9          Regarding compulsory process in Ohio, we've
10    identified four former employees of TOA who are located
11    there that would be subject to the absolute subpoena
12    power of the Northern District Court.  Two of them have
13    identified they're unable to travel to Marshall, and the
14    other two have indicated an unwillingness to travel.
15    We've identified four TOA customers that are using the
16    ETAdirect routing system within the absolute subpoena
17    power of the Northern District, and at least one is
18    headquarter in Twinsburg, and we submit that that is --
19    also makes the factor weigh heavily in favor of the
20    transfer.
21          In comparison to the Eastern District of
22    Texas, there's no witness identified that's subject to
23    the absolute subpoena power.  The only one that's in
24    Plano is a contractor who's been working for the company
25    all of three months.  Her job function is training in

1    Latin America.

2              There are no non-party witnesses that have

3    been identified in the Eastern District of Texas, and

4    under the Genentech and Hoffmann-La Roche cases,

5    transfer is appropriate.

6              Regarding convenience and costs, we've set

7    this forth mostly in the stipulation.  As CSG stated in

8    its opposition brief, Docket Index 16 at Page 5, Ohio is

9    not appreciably more convenient than Texas for witnesses

10   based in Colorado.  We submit that's an admission, Your

11   Honor, that Ohio is more convenient than Texas for the

12   Denver-based witnesses.  As we noted, CSG chose to bring

13   this case here in Texas, indicating that this Court is

14   more convenient than Denver for this litigation.  That

15   submits that the evidence supports transfer to the

16   Northern District, based on convenience and cost.

17             Also, when you look at where the prosecuting

18   attorneys are located, they're in Chicago and New York.

19   And when you consider them in connection with the other

20   non-party witnesses that have been identified in Ohio,

21   the time to travel is considerably shorter to Cleveland

22   for them than it is to Marshall, Texas.  This factor

23   also weighs in favor of transfer.

24             THE COURT:  What else, counsel?

25             MR. ISACKSON:  Regarding the public factor,

```
 1   Your Honor -- I'm sorry, the strong local interest,
 2   respectfully TOA is a poster child for the Beachwood,
 3   Ohio, community, and what works for the American dream
 4   is local innovation in Northern Ohio.  It's been
 5   recognized.  Its presence there since 2003, going from a
 6   free loader to a taxpayer with 55 employees, with
 7   facilities to handle all of its visiting employees, the
 8   accolades its received, we suggest that the Northern
 9   District of Ohio weighs strongly in favor of transfer.
10            As the Nintendo court held, in an instance
11   such as here, quote, in a case featuring most witnesses
12   and evidence closer to the transferee venue with fewer
13   no convenience factors favoring the venue chosen by
14   Plaintiff, the trial court should grant a motion to
15   transfer.
16            Thank you, Your Honor.
17            THE COURT:  All right.  Closing argument
18   from the Plaintiff.
19            MR. JOHNSTON:  Yes, Your Honor.  Thank you.
20            Your Honor, the burden is on TOA to
21   demonstrate that the Northern District of -- of Ohio is
22   a clearly more convenient forum than the Eastern
23   District of Texas.  I think we've established that there
24   are infringing acts throughout the Eastern District of
25   Texas, therefore, venue is appropriate here in this
```

1    district.

2              The question then becomes has TOA met its

3    burden -- its significant burden to establish that the

4    Northern District of Ohio is clearly more convenient.

5    Your Honor, I would submit, based on this record, that

6    given the sources of proof, the location, the global

7    location in some instances, the remote working

8    arrangements for both companies' parties' witnesses,

9    this is basically a push in terms of convenience.

10   That's at most what TOA has shown that the Northern

11   District of Ohio may be as convenient as the Eastern

12   District of Texas, but it's clearly not more

13   convenient.

14             I think that if you look at the evidence in

15   terms of the location of non-party witnesses, which this

16   Court has identified as being a critical factor, digging

17   a little bit deeper behind what those non-parties are,

18   we -- we have the former TOA -- TOA employees.  I think

19   Mr. Carmi acknowledged that Mr. Cook can provide

20   information as to TOA financial information, therefore,

21   these former employees, who are former CFOs, are simply

22   not relevant witnesses.

23             I'd direct the Court to a recent decision of

24   the Eastern District -- DietGoal versus Time.  It's 2013

25   Westlaw 12222303.  Also, it's clear that the

1  documentation that is relevant in this case is stored

2  electronically.  Here we have an admission from

3  Mr. Carmi that all of the pertinent documentation, save

4  and except for some notebooks, are stored on a

5  cloud-based server that is equally accessible here in

6  the Eastern District of Texas as they are in the

7  Ukraine, as they are in the Northern District of Ohio.

8           I direct the Court to another case called

9  Sipco versus Control4, 2011 Westlaw 529336.  With

10  respect to that issue of a corporate representative

11  admitting that the location of documents being stored in

12  a cloud-based server essentially negates that -- that

13  issue as far as whether we entertain the fiction of --

14  of having to physically transport documents from one

15  location to another.

16           Your Honor, the hub of the operation for at

17  least the most critical part of TOA's operation, which

18  is the actual programming of its solution, is housed in

19  the Ukraine, not in the Northern District of Ohio.

20           Mr. Turchyn has identified at least two

21  witnesses by name here today that would have pertinent

22  information relating to the programming and operation of

23  the software.  Those -- those witnesses are based in the

24  Ukraine.

25           The inventors are based in Denver.

1                The prosecuting attorneys -- at this point,

2     Your Honor, they're basically -- we have the same

3     situation that we had with these prior art witnesses.

4     We don't know what the assertion is in terms of laches

5     or other defenses, but, frankly, none of those

6     prosecuting attorneys are within the subpoena power of

7     either court.  Again, this is at best a push.

8                In the --- in the real world, how this case

9     will be litigated is that those folks will be deposed,

10    if they are deposed, and then their -- their testimony

11    brought by a deposition, if they ever see the light of

12    day in the courtroom.

13               In conclusion, Your Honor, we have important

14    witnesses that are very close to this venue.  We have

15    Mr. Hajibishi, who provided a key demonstration.  We

16    have Mr. Remark, who is overseeing customer

17    relationships for two companies operating in the Eastern

18    District of Texas.  And those two same companies, DISH

19    and Suddenlink, are prospective customers of CSG.

20               Your Honor, I would respectfully submit that

21    TOA has a substantial burden to establish that the

22    Northern District of Ohio is clearly more convenient.

23    I'd submit that they have not met that burden, and that

24    this case should proceed in this venue.

25               Thank you.

```
 1                    THE COURT:  All right.  Counsel, thank you
 2      for your presentations and your argument.  It's a few
 3      minutes before noon.  The Court is going to recess until
 4      2:00 o'clock.  I'll take this matter under advisement,
 5      and at 2:00 o'clock, I'll reconvene and give you a
 6      ruling from the bench.
 7                    The Court stands in recess until 2:00 p.m.
 8                    COURT SECURITY OFFICER:  All rise.
 9                    (Lunch recess.)
10                    COURT SECURITY OFFICER:  All rise.
11                    THE COURT:  Be seated, please.
12                    The Court has considered the argument and
13      evidence presented during this morning's evidentiary
14      hearing.  The Court has reviewed and accepted as true
15      the stipulated facts agreed to by both parties, as
16      referenced in Document 26 on the docket of this case.
17                    Clearly, the Defendant, TOA, contends that
18      the Northern District of Ohio is more convenient than
19      the Eastern District of Texas.  And the Plaintiff, CSG
20      Systems, disputes that.
21                    The Court has considered these matters
22      carefully, and based on the Court's review, the Court
23      hereby denies the Defendant's motion to transfer for the
24      following reasons:
25                    The Federal Circuit has made it clear that
```

1    in patent infringement cases the matter of venue

2    analysis should be governed by the law of the regional

3    circuits.  In this case, that would clearly be the

4    guidance from the Fifth Circuit Court of Appeals.  Under

5    our circuit law in the Fifth Circuit, a venue analysis,

6    such as this, involves consideration of four private

7    interest factors and four public interest factors.

8              There's no dispute in this matter as to

9    whether the case could have originally been brought in

10   the Northern District of Ohio, and, therefore, that

11   initial threshold issue is met and requires the Court,

12   under the guidance of the Fifth Circuit, to take up and

13   consider the public and private interest factors.  Those

14   are as follows, and my analysis and consideration of

15   those is as follows:

16             Turning first to the private interest

17   factors, the first is the relative ease of access to

18   sources of proof.  The Court has considered the argument

19   and the evidence and finds that neither party is

20   headquartered in the Eastern District of Texas.  The

21   Plaintiff in this case, CSG, is a Delaware corporation

22   headquartered in Denver, Colorado.  And TOA, the

23   Defendant and movant in the transfer motion, is a

24   Delaware corporation headquartered in Beachwood, Ohio,

25   which is a suburb of Cleveland.

 1          That being the case, the movant, TOA, has 55

 2     employees in its Beachwood, Ohio office, while it has

 3     150 employees in its offices in the Ukraine and that the

 4     Ukraine is the location where the products at issue were

 5     developed and the programmers are available with regard

 6     to those products.  Majority of the movant's

 7     documentation, with the exception of certain notebooks,

 8     are -- which are -- which notebooks are only maintained

 9     in hard copy, but the vast majority of the Defendant's

10     documentation is -- is stored electronically and

11     accessible on the cloud.  The Court finds that this

12     digital information is not stored in any one location,

13     but because it's stored on the cloud, it's effectively

14     stored everywhere, including the Eastern District of

15     Texas.

16          The programming and technical design of the

17     accused products are done in the Ukraine.  The Court

18     heard from Alexey Turchyn who's primarily responsible

19     for the development and testing of one of the accused

20     products.  He is a Ukrainian citizen with a Ukrainian

21     family, a home in the Ukraine, even though he does spend

22     a minority of his time traveling to Cleveland, Ohio.

23     The Court find that is TOA's customers are located

24     across the United States.

25          The Court finds that Danny Little is a

1   potential witness of particular relevance in this case,

2   having worked for both parties and having left the

3   Plaintiff and become an employee of the Defendant and

4   that Mr. Little resides in Colorado.  Pursuant to the

5   stipulated facts between the parties, travel for

6   Mr. Little from Colorado takes less time and is more

7   convenient to travel to this venue to the -- than to the

8   Northern District of Ohio.

9           The Plaintiff alleges that it lost customers

10  to the Defendant, those including specifically

11  Suddenlink and DISH Networks.  Suddenlink services

12  territories in the Eastern District of Texas.  The Court

13  finds no evidence showing that Suddenlink is located in

14  the Northern District of Ohio or services customers

15  there.

16          DISH Networks is one of the Defendant's

17  largest customers using the accused products and

18  services, and it operates within both the Eastern

19  District of Texas and the Northern District of Ohio.

20  The Defendant has five employees who reside and work in

21  the State of Texas.  The Defendant has not shown that

22  other of its employees have more relevant knowledge than

23  those.  Those include Hamid Hajibishi, who is a

24  principal solutions architect at the Defendant's

25  location in Coppell, Texas, near Dallas, that he has

1   relevant knowledge because he led a demonstration to get

2   or help acquire the DISH contracts for the accused

3   products.  This group of five includes Travis

4   Somerville, solutions architect in Austin; Markus

5   Remark, a vice president of consumer operations in

6   Austin; Tom Meeks, a sales engineer in or near San

7   Antonio; and Brian Garwood, a middle market sales

8   director in Austin.  These are not insignificant

9   positions, and they -- Court finds that these are

10  persons with relevant knowledge of facts related to

11  the -- this case.

12          The Plaintiff has two offices in Texas, one

13  in Coppell -- or Coppell, near Dallas, and one in San

14  Antonio, employs a total 73 employees.  Included among

15  those are Mr. Reed Jenkins, who is a senior strategic

16  accounts manager and is a person the Court finds has

17  relative knowledge of the Workforce Express product,

18  which is one of the accused products in this case.

19  Mr. Jenkins resides and works at the Plaintiff's offices

20  in and near San Antonio.

21          All of these facts having been found by

22  Court, the Court finds that on balance, the first

23  private interest factor under venue analysis weighs

24  slightly against transfer.

25          The second private interest factor is the

1    availability of compulsory process.  The Court finds no

2    evidence of any relevant non-parties who are within

3    either a hundred miles of the Northern District of Ohio

4    or a hundred miles of the Eastern District of Texas.

5    The Defendant has argued that it has some ex-employees,

6    previously holding the position of chief financial

7    officer, who reside in Ohio, but the Defendant has not

8    established the relevance with regard to these

9    expertises' supposed knowledge, and there has been

10   evidence produced today that there are other witnesses

11   available who would either duplicate what knowledge they

12   might have.  And also there's been evidence that there

13   is no real dispute between the parties regarding the

14   integrity of the Defendant's financial data, which the

15   Court would consider to be part of what ex-CFOs would

16   have knowledge of.

17          None of the inventors or prosecuting

18   attorneys are located in either the Eastern District of

19   Texas or the Northern District of Ohio.  On balance, the

20   Court finds that the second private interest factor for

21   venue analysis is neutral.

22          The third private interest factor is the

23   cost of attendance of willing witnesses.  The clear

24   majority of the relevant evidence shows that technical

25   witnesses for the accused products reside in the

1  Ukraine.  The cost of traveling from the Ukraine to

2  Cleveland, Ohio, is substantially the same as the cost

3  of traveling from the Ukraine to Marshall, Texas.  The

4  Court views the third private interest factor as

5  neutral.

6            The fourth private interest factor are other

7  practical problems.  There's been no evidence of any

8  such other practical problems, and the Court finds there

9  is none, therefore, this issue or this factor is neutral

10 with regard to transfer.

11           The four public interest factors are next

12 taken up and considered by the Court, the first of which

13 is reducing court congestion.  Based on the parties'

14 stipulated facts, there are more filings per Judge in

15 the Northern District of Ohio than there are in the

16 Eastern District of Texas.  And the median time to trial

17 is substantially the same in both venues.  The Court

18 finds that this might arguably be slightly against

19 transfer or from the Defendant's standpoint, at best

20 neutral.  The Court considers it neutral.

21           The second public interest factor is the

22 localized interest.  The Defendant, TOA, has 55

23 employees in the Cleveland, Ohio, area.  The majority of

24 its technical employees and development of the accused

25 product's employees are in the Ukraine.  The Defendant

1    has made much of Beachwood, Ohio, but the evidence is

2    clear that Beachwood is but a suburb and a part of the

3    larger Cleveland metropolitan area and the relationship

4    of their 55 employees within the larger Cleveland

5    metropolitan area does not establish any localized

6    interest that could be fairly characterized as more than

7    de minimus.

8              While TOA may be a prominent business in

9    Beachwood, TOA's emphasis on Beachwood is misplaced when

10   it's clear that that area is but a -- a part of the

11   larger Cleveland metropolitan area.  The analysis by the

12   Court for localized interest, considering the 55

13   employees of TOA, is properly applied to the Cleveland,

14   Ohio area and not the small individualized suburb of

15   Beachwood.

16             The accused product is sold and used by

17   customers all over the United States, including the

18   Eastern District of Texas.  Again, the Court believes

19   that this factor could be argued to be slightly against

20   transfer or at the best from the Defendant's standpoint,

21   neutral.  The Court, accordingly, has treated it as

22   neutral.

23             The third public interest factor is

24   familiarity with the controlling law.  There's been no

25   dispute between the parties of any difference between

1   the venues with regard to their knowledge or

2   understanding of controlling law.

3           The Court, therefore, looking at all of the

4   public and private interest factors finds that one of

5   those interest factors argues against -- slightly

6   against transfer.  The others in their light best

7   favorable to the Defendant are neutral and not more

8   than neutral.  Therefore, based on the Court's analysis,

9   the Court finds that the moving Defendant has failed to

10  meet its substantial burden -- burden of proving that

11  transfer is warranted and that venue in the Northern

12  District of Ohio is clearly more convenient than venue

13  in the Eastern District of Texas.

14          Therefore, the Court has and does deny the

15  Defendant's motion to transfer.  Given the Court's

16  ruling from the bench this afternoon on the pending

17  motion to transfer, the companion motion from the

18  Defendants to stay the proceedings in this Court is

19  denied as moot.

20          That is the ruling of the Court in regard to

21  this matter.  This hearing is concluded.

22          Counsel, you are excused.

23          COURT SECURITY OFFICER:  All rise.

24

25

148

```
 1                      CERTIFICATION

 2

 3            I HEREBY CERTIFY that the foregoing is a

 4    true and correct transcript from the stenographic notes

 5    of the proceedings in the above-entitled matter to the

 6    best of my ability.

 7

 8

 9
      SHELLY HOLMES                          Date
10    Deputy Official Reporter
      State of Texas No.: 7804
11    Expiration Date: 12/31/14

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```